## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

BRITTANY BLACK, PRESTON OWENS,
and RACHEL WRIGHT, on behalf of
themselves and all others similarly situated,

    Plaintiffs,

    v.

BO LUCKEY, in his official capacity as
Chief of the Capitol Police, a unit of the
Mississippi Department of Public Safety;
and SEAN TINDELL, in his official
capacity as Commissioner of the Mississippi
Department of Public Safety,

    Defendants.

Case No.   3:26-cv-377-DPJ-MTP

Class Action

## CLASS ACTION COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1. Plaintiffs are three homeless residents of Jackson, Mississippi, who hold signs on public streets and sidewalks soliciting help to meet their personal needs. They face citation, arrest, criminal prosecution, and orders to move along for holding signs such as "hungry, homeless, anything helps" without first getting permission from Defendants to speak and paying the government to exercise their First Amendment rights to solicit charity. Through this lawsuit, they challenge the State of Mississippi's Safe Solicitation Act ("the Act") on its face and as applied under the First and Fourteenth Amendments.[1]

2. In 2024, an estimated 1,041 people experienced homelessness in the State of Mississippi, a six percent increase from 2023. An estimated 167 of those people were families with children, and 40 were veterans. About 47 percent of people experiencing homelessness in 2024 were unsheltered, the country's twelfth highest percentage. And about 48 percent of veterans experiencing homelessness were unsheltered, tied for the country's fifth highest percentage.[2]

3. Against that backdrop, the Mississippi Legislature enacted the Act in 2025. The Act prevents people in need from exercising their First Amendment right to engage in charitable solicitation without first requesting permission from the government to speak and paying the government to exercise their First Amendment rights.

---

[1] H.B. 1197 (Miss. 2025) created the Safe Solicitation Act, which is codified at Miss. Code §§ 17-31-1 through 17-31-11. H.B. 1197 also amended Miss. Code §§ 45-1-19(6), 97-35-23(1), and 97-35-25(1).

[2] Tanya de Sousa & Meghan Henry, U.S. Department of Housing and Urban Development, *The 2024 Annual Homelessness Assessment Report (AHAR) to Congress* 8, 54, 77 (Dec. 2024), https://tinyurl.com/5fxhdcst; *see also* City of Jackson, Miss., *Functional Zero*, https://web.archive.org/web/20240719080308/https://jacksonms.gov/functional-zero/ (the City of Jackson's Mayor noting in 2024 that the City had "the highest number of individuals experiencing homelessness in the state").

4. The Act makes it unlawful for any person to "solicit" in any municipality, county, or political subdivision in the State of Mississippi without a solicitation permit. Miss. Code § 17-31-5(1). The Act defines solicitation as requesting (1) "money or anything of value as a donation or contribution" or (2) "any other thing of value in exchange for any goods, wares, merchandise or thing of value" on public streets and sidewalks throughout the State of Mississippi. *Id.* § 17-31-3(b).

5. Defendants Bo Luckey, the Capitol Police Chief, and Sean Tindell, the Commissioner of the Mississippi Department of Public Safety, have used the Act to cite or issue move along orders to Plaintiffs and others in need. Capitol Police officers repeatedly tell Plaintiffs that they will arrest Plaintiffs if they continue to hold their signs, yell at Plaintiffs over loudspeakers, curse at Plaintiffs, and flash their blue lights at Plaintiffs until they leave the area. Plaintiffs have seen Capitol Police officers do the same things with others while they are soliciting.

6. Plaintiffs are afraid and concerned about holding their signs and sometimes choose not to do so because of the Capitol Police's threats of arrest and move along orders. Despite Defendants' enforcement of the Act, however, Plaintiffs have no choice but to continue to hold signs to solicit from roads and sidewalks to meet their daily needs.

7. Plaintiffs bring this action on behalf of themselves and all others similarly situated. Plaintiffs respectfully request that the Court declare the Act unconstitutional under the First and Fourteenth Amendments, and preliminarily and permanently enjoin Defendants' enforcement and implementation of the Act.

## JURISDICTION AND VENUE

8. This action arises under the First and Fourteenth Amendments to the United States Constitution.

2

9.     The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

10.    The Court may provide the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, and the Court's equitable powers.

11.    Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2).

## PARTIES

### Plaintiffs

12.    Plaintiff Brittany Black is a homeless resident of Jackson. She has been homeless in Jackson, and has held signs soliciting help, since around 2024.

13.    Plaintiff Preston Owens is a homeless resident of Jackson. He has been homeless in Jackson, and has held signs soliciting help, since around 2024.

14.    Plaintiff Rachel Wright is a homeless resident of Jackson. She has been homeless in Jackson, and has held signs soliciting help, since around 2024.

15.    All three Plaintiffs hold their signs along public roadways in Jackson to solicit monetary help and to request other items to meet their basic needs. Plaintiffs each hold their signs communicating messages of need multiple times a week. Their signs say things like "hungry, homeless, anything helps."

16.    Plaintiffs all intend to continue to hold their signs requesting help along public roadways in Jackson.

17.    Plaintiffs all have chosen the locations in which they hold signs intentionally. They solicit on public streets and sidewalks to see enough people to communicate that they are hungry and homeless and in need of charitable assistance.

3

18.    When soliciting, Plaintiffs stand on the sidewalk, on the side of the road, or on medians. They do not enter the street unless someone responds to their sign and indicates they want to give them something, and they enter the street only when a traffic light is red.

19.    Plaintiffs are indigent, cannot pay $25 per day for a permit, and cannot travel to downtown Jackson daily or regularly to apply for a permit.

20.    When Plaintiffs try to solicit along public streets and sidewalks, Capitol Police officers tell them to get a job and that they will arrest them if they continue to hold their signs. Capitol Police officers also yell at Plaintiffs over loudspeakers, curse them, and flash their blue lights at them until they leave the area. Plaintiffs have witnessed Capitol Police officers interact the same way with other people experiencing homelessness.

21.    As a result of the Act and the Capitol Police's actions, Plaintiffs are concerned about holding their signs and sometimes do not because of the Capitol Police. However, they feel that they have no choice but to continue to do so in the future to meet their daily needs.

22.    Plaintiffs are participating in the lawsuit to vindicate their constitutional rights and the constitutional rights of other Class members. They want to help themselves and other people who are similarly situated.

### Defendants

23.    Defendant Sean Tindell is the Commissioner of the Mississippi Department of Public Safety. He is sued in his official capacity. As Commissioner, Defendant Tindell is responsible for the operation of the Department of Public Safety, including appointment of the Chief of the Office of Capitol Police and oversight of that Office. Miss. Code § 45-1-2(2)–(4). The Department of Public Safety has jurisdiction to enforce Mississippi state law within the City of Jackson, *id.* § 45-1-19(6)(b), and "primary jurisdiction relative to any other state or municipal law

4

enforcement agency" to enforce state law within the Capitol Complex Improvement District ("CCID"), *id.* § 45-1-19(6)(a); *see also id.* § 45-1-19(1) (the Department, "through the Office of Capitol Police," has jurisdiction to enforce state law on Capitol Complex properties). References to the Capitol Police and to Defendant Bo Luckey throughout this Complaint also refer to Defendant Tindell.

24.     Defendant Bo Luckey is the Chief of the Office of the Capitol Police, a unit of the Mississippi Department of Public Safety. *Id.* § 45-1-2(2)(i). He is sued in his official capacity. Defendant Luckey was appointed by and "serve[s] at the pleasure of the commissioner" of the Department of Public Safety, Defendant Tindell. *Id.* § 45-1-2(4). As Chief of the Office of the Capitol Police, Defendant Luckey is responsible for the operation of that Office. Defendant Luckey may "make arrests for any violation of any law of the State of Mississippi" occurring within the CCID, *id.* § 45-1-19(6)(a), or the City of Jackson, *id.* § 45-1-19(6)(b). The Safe Solicitation Act authorizes Defendant Luckey "to issue solicitation permits in conformity with the Safe Solicitation Act . . . within the boundaries of the Capitol Complex Improvement District." *Id.* § 45-1-19(6)(c)(ii). References to the Capitol Police throughout this Complaint also refer to Defendant Luckey.

## BACKGROUND

### The Safe Solicitation Act

25.     Enacted in 2025, the Safe Solicitation Act makes it "unlawful for any person to solicit in any municipality, county or political subdivision of this state without a solicitation permit issued by the municipality, county or political subdivision in which the solicitation will occur." Miss. Code § 17-31-5(1).

5

*Solicitation Definition*

26.    The Act defines "solicitation" or "solicit" to mean "[1] to request money or anything of value as a donation or contribution while standing, sitting or positioned in any manner on any road, street, highway median, traffic island or highway intersection; or [2] to request any other thing of value in exchange for any goods, wares, merchandise or thing of value while standing, sitting or positioned in any manner on any road, street, highway median, traffic island or highway intersection." *Id.* § 17-31-3(b).

27.    The first clause of the definition describes charitable solicitation without a permit, and the second clause describes commercial solicitation without a permit.

28.    The Act does not govern other types of solicitation, such as requests for directions, a signature on a petition, or support for a political cause.

29.    The Act regulates solicitation on sidewalks.

30.    The Act exempts solicitation permit holders from the crime of obstruction of a public sidewalk. *See id.* § 97-35-25.

31.    The Act provides that a "sidewalk" is one place "where . . . solicitation occurs." *See id.* § 17-31-3 (definition of "Governing authority").

32.    The Act's lead sponsor conceded on the House Floor that she had no empirical data that soliciting is a public or traffic safety problem.

33.    Defendants did not try any other alternatives to restricting charitable solicitation before the Legislature passed the Act.

34.    Defendants cannot meet their burden to justify why it is necessary to criminalize solicitation on all public streets in the State of Mississippi.

6

35.    Defendants cannot demonstrate that other alternatives are inadequate to meet their public safety interests or any other compelling or substantial government interest.

36.    Defendants cannot establish that the Act leaves open ample alternative channels for communication.

*Solicitation Permit*

37.    The Act defines "solicitation permit" to mean "a form designed and provided by a municipality, county, political subdivision of the state or state agency as proof that a person is authorized to solicit." *Id.* § 17-31-3(c).

38.    "Only one (1) permit will be issued for an intersection on any given day." *Id.* § 17-31-9(2). Solicitation permits are "issued on a first come basis to those applicants who submit a completed application form." *Id.* An application "shall" include the applicant's name, mailing address, and telephone number, as well as the location and time the solicitation will occur. *Id.* § 17-31-9(3).

39.    "The municipality, county or political subdivision is authorized to charge a fee for the solicitation permit" of up to $25, regardless of the permit process's administrative costs. *Id.* § 17-31-5(2).

40.    The Act leaves it up to each municipality, county, or political subdivision to develop its own permit application and process.

41.    The Act does not set a time limit for decisions on permit applications, provide for review of an application denial by any court or administrative tribunal, or provide any guidance on whether and how governing authorities should assess the daily permit fee.

7

42.     The Act also does not include an indigency exception. If a person cannot afford to pay up to $25 a day—more than $700 a month—for a governing authority's permit fee, the Act makes it unlawful for that person to solicit on streets and sidewalks throughout Mississippi.

### *Restrictions on Solicitation*

43.     A solicitation permit allows for solicitation only "between the hours of 9:00 a.m. and one hour before sunset, as determined by the governing authority." *Id.* § 17-31-9(1).

44.     Year round, that timing restriction prohibits all solicitation before 9:00 A.M., when many motorists are driving to work. For about a third of the year, it also prohibits all solicitation after 5:00 P.M., when many motorists are driving home from work.[3]

45.     Even if someone has a solicitation permit and is soliciting within the prescribed hours, the local governing authority "may stop solicitation activities" if certain "terms and conditions . . . are not met." *Id.* § 17-31-7(2) and (3).

46.     The "terms and conditions" are that a solicitor:

    a.     must be in a roadway "only while the controlling traffic signal prohibits vehicular movement";

    b.     must remain within 100 feet of the approved intersection;

    c.     must solicit only during daylight hours;

    d.     must not "impede traffic";

    e.     must not "interfere with the safe and efficient movement of traffic";

    f.     must not "cause danger to the participants or the public";

    g.     must not "persist after solicitation has been denied";

    h.     must not "act in a . . . harassing manner";

    i.     must not "act in a demanding . . . manner"; and

    j.     must not "use any sound or voice-amplifying apparatus or device."

---

[3]     *See* Miss. Code § 17-31-9(1) (setting a "one hour before sunset" end time); *Sunset Table for 2026, Location: Latitude 32.29810 Longitude -90.18060*, Nat'l Oceanographic & Atmospheric Admin., Glob. Monitoring Lab. (Feb. 2, 2026), https://perma.cc/X5TW-DKE8 (showing that one hour before sunset occurs before 5:00 P.M. from early November to early March).

*Id.* § 17-31-7(2).

47.    The Act does not specify how long a governing authority may "stop solicitation activities" when someone allegedly violates one of those "terms and conditions."

48.    The Act amends state obstruction statutes to exempt from those criminal offenses only solicitation that is "authorized . . . in accordance with the Safe Solicitation Act." *Id.* § 97-35-23, 97-35-25.

*Department of Public Safety and Capitol Police Authority*

49.    The Department of Public Safety has jurisdiction to enforce Mississippi state law within the City of Jackson, *id.* § 45-1-19(6)(b), and "primary jurisdiction relative to any other state or municipal law enforcement agency" to enforce state law within the CCID, *id.* § 45-1-19(6)(a); *see also id.* § 45-1-19(1) (the Department, "through the Office of Capitol Police," has jurisdiction to enforce state law on Capitol Complex properties).

50.    The Act gives the Capitol Police Chief authority to issue solicitation permits "within the boundaries of the [CCID]." *Id.* § 45-1-19(6)(c)(ii).

51.    As an office of the Department of Public Safety, the Capitol Police have "primary jurisdiction" to enforce state law, including the Act, within the CCID. *Id.* § 45-1-19(6)(a). The Capitol Police also have "jurisdiction relative to the enforcement of all laws of the State of Mississippi within the boundaries of the City of Jackson, Mississippi." *Id.* § 45-1-19(6)(b).

52.    After boundary expansions in 2023 and 2025, the CCID encompasses a substantial portion of the City of Jackson, including most streets and sidewalks where charitable solicitation has been—and remains—concentrated:[4]

---

[4]    *See* Capitol Complex Improvement Dist., *Amendments to CCID Master Plan 2023 Update (effective July 1, 2025)*, at 1, 3 (July 2025), https://tinyurl.com/4kz7m4mw (showing that CCID encompasses downtown Jackson, Belhaven, Fondren, Eastover, and much of Northeast Jackson, among other areas); Miss. Code § 29-5-203; Miss. Dep't of Pub. Safety, *Capitol Watch*, at 3 (Oct. 15, 2025),

9



*Effective Date*

53.    The Act became "legal and binding in every county and municipality unless a county or municipality opt[ed] out . . . through a vote by the board of supervisors of the county or the governing authority of the municipality . . . within six (6) months after" the Act's effective date. Miss. Code § 17-31-11.

54.    The Act did not give the Capitol Police discretion to opt out of enforcing the Act.

55.    The Act's effective date was July 1, 2025. H.B. § 10 (Miss. 2025). Each county and municipality had until January 1, 2026, to opt out.

56.    The City of Jackson did not opt out of the Act.

---

https://tinyurl.com/jjuucpj4 (Capitol Police's newsletter: "Notably, the number of [panhandling] calls more than doubled after the [2023] expansion of the CCID.").

10

57.    A small fraction of Mississippi's hundreds of counties and municipalities opted out by July 1, 2025. For one example, the City of Bay St. Louis opted out, explaining that the law was unnecessary given existing "state law[s] establishing adequate procedures and requirements for controlling access to rights-of-way." For another, a City of Columbus official explained why she supported Columbus's decision to opt out: "My thought was, 'my God, if you don't have the money, you can't afford to even go and buy a permit.'"[5]

58.    Except in the small fraction of municipalities and counties that opted out, the Act now applies statewide.

### Defendants' Enforcement

59.    Defendants have proceeded to enforce the Act.

60.    Before the Act went into effect, Defendant Tindell announced the Capitol Police's plan to charge a $25 permit fee—the statutory maximum fee. The *Clarion Ledger* reported: "According to Tindell, Capitol Police, currently staffed at 160 officers, aimed to grow to 200 to meet the new laws' demand despite 'budget cuts and legislative reductions.'"[6]

61.    After the Act took effect in July 2025, the Capitol Police began enforcing it through move along orders. Defendant Luckey testified in August and November 2025 that the Capitol Police had "not been allowing people to panhandle" and had been asking solicitors to "move on"—

---

[5]    *See, e.g.*, City of Bay St. Louis, Ms., *Resolution of the Mayor and City Council of the City of Bay St. Louis, Mississippi Opting Out of the Safe Solicitation Act* (Dec. 3, 2025), https://perma.cc/9693-4WD7; Grace Brister, *City of Columbus Opts-Out of 'Safe Solicitation Act'*, WCBI-TV (Oct. 7, 2025), https://tinyurl.com/b2rchree.

[6]    Pam Dankins & Grant McLaughlin, *Jackson and Capitol Police Are Not Fully Prepared to Enforce Anti-Homeless Bills on July 1*, Clarion Ledger (June 30, 2025), https://perma.cc/Y4ZF-235Q.

11

even though the Capitol Police did not have a permit process in place. The move along orders, Luckey testified, led to a decrease in charitable solicitation.[7]

62.    Around December 2025—about five months after the Act took effect—the Capitol Police began implementing its one-page application form:

---

[7]    Miss. Legislature, *Capital City Revitalization Committee - Room 113, August 27, 2025; 10:00 AM*, at 1:14:50–1:16:57 (YouTube, Aug. 27, 2025), https://tinyurl.com/jczzvuk8 (Defendant Luckey: "Because we don't have a process to issue permits, we have not been allowing people to panhandle—panhandle or solicit on the corners. So we have been asking them to move on until we get the permit process up and going. . . . We have been moving solicitors along. We have seen a decrease in the amount of calls we're getting with the solicitation."); Miss. Legislature, *Senate Study Committee on Jackson - Room 216, Nov 18, 2025; 10:00 AM*, at 7:12–8:06 (YouTube, Nov. 18, 2025), https://www.youtube.com/watch?v=JZKXphNylVg (Defendant Luckey: "We have been seeing a decrease in [panhandling]. However, it has started to pick back up a little bit. . . . We're trying to stay on top of that. Our stance has been, while we do not have a permit process in place at the moment, we are asking people to move on and advising them that it is illegal to solicit donations and money and services without a permit.").

63.     The final application form shows that the Capitol Police indeed exercised its discretion to charge the statutory-maximum permit fee of $25. The Capitol Police also decided to make applicants apply "in person."

64.     The application form requires applicants to disclose their name, address, and telephone number, as well as the date and time when they intend to solicit. The application form also requires applicants to disclose whether they are affiliated with an organization.

65.     Like the Act itself, the application form does not provide any guidance about what factors should guide officials' discretion when granting or denying a permit, impose a timeframe for when a decision must be made, or contemplate a process to appeal an adverse decision.

66.     The application form is not on the Department of Public Safety's website, and multiple employees at the Capitol Police building in Jackson have expressed uncertainty about the permit application process.

67.     The Capitol Police did not adopt any written policies, procedures, or similar documents in the months after it adopted its one-page application form.

68.     Between July 1, 2025—when the Act went into effect—and early March 2026, Defendants received more than 100 calls about charitable solicitation.

69.     Defendants dispatched officers to more than 90 percent of those calls.

70.     Defendants have issued about thirty permits, with the first one issued on March 10, 2026—more than eight months after the Act took effect.

71.     The Capitol Police have cited at least one individual for violating the Safe Solicitation Act under Miss. Code. § 97-35-23 by "obstruct[ing] the public streets [and] roadways at State and High Street for the sole purpose of panhandling without a permit." *See* Miss. Code. § 97-35-23 (exempting solicitation with a permit only from obstruction offense).

13

72.     Capitol Police officers repeatedly tell Plaintiffs that they will arrest Plaintiffs if they continue to hold their signs, yell at Plaintiffs over loudspeakers, curse at Plaintiffs, and flash their blue lights at Plaintiffs until they stop soliciting charity. Plaintiffs have seen Capitol Police officers do the same things with other people experiencing homelessness while they are soliciting charity.

73.     Plaintiffs are afraid and concerned about holding their signs and sometimes choose not to do so because of the Capitol Police's threats of arrest and their negative interactions with Capitol Police officers ordering them to move along. However, Plaintiffs have no choice but to continue to hold signs to solicit from roads and sidewalks to meet their daily needs.

74.     The Capitol Police continue to enforce the Act, including by ordering people soliciting without a permit to move along.

## CLASS ALLEGATIONS

75.     Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), Plaintiffs Black, Owens, and Wright seek to certify a Class of Plaintiffs (the "Class"), on behalf of themselves and all others similarly situated, for the purpose of asserting their claims for declaratory and injunctive relief.

76.     The proposed Class is defined as: "All persons who currently or will in the future solicit as defined in Miss. Code § 17-31-3(b) within the jurisdiction of the Capitol Police."

### Numerosity, Fed. R. Civ. P. 23(a)(1)

77.     The precise size of the Class is unknown but is substantial.

78.     The Class is forward-looking and includes many people who currently are experiencing homelessness in Jackson.

14

79.     According to a recent Point in Time Count by the U.S. Department of Housing and Urban Development ("HUD"), there are more than 200 people experiencing homelessness in Hinds, Rankin, and Madison counties alone.

80.     Many people experiencing homelessness will at some point solicit to meet their basic needs and therefore are members of the putative Class.

81.     Between July 2025—when the Act went into effect—and March 2026, Defendants responded to approximately 100 calls about solicitation.

82.     Class members, many of whom are homeless, lack the financial resources needed to bring an independent action or to be joined in this action.

83.     Joinder of every member of the Class would be impracticable.

### Commonality, Fed. R. Civ. P. 23(a)(2)

84.     Plaintiffs raise claims based on questions of law and fact that are common to, and typical of, the putative Class members they seek to represent.

85.     Common questions of fact presented in this case include:

    a.     Whether Defendants condition the exercise of Plaintiffs' and the putative Class's First Amendment rights on obtaining a solicitation permit from Defendants;

    b.     Whether the permit process gives discretion to Defendants to grant or deny solicitation permits to Plaintiffs and the putative Class and, if so, what criteria, if any, constrain that discretion;

    c.     Whether Plaintiffs and the putative Class are required to pay an application fee to obtain a solicitation permit and the cost of that permit;

    d.     What administrative costs, if any, are associated with processing solicitation permit applications;

    e.     Whether Defendants have established any deadlines for approving or denying a solicitation permit and a process for appealing the denial of a permit application;

    f.     The reasons, if any, for requiring Plaintiffs and the putative Class to obtain a solicitation permit before exercising their First Amendment rights to engage in charitable solicitation; and

15

g.     Whether Defendants prosecute, threaten to prosecute, or order individuals to move along for standing on public streets and soliciting financial assistance without a solicitation permit.

86.     Common questions of law presented in this case include:

a.     Whether the Safe Solicitation Act infringes on constitutionally protected speech under the First Amendment and whether the government can meet its burden to justify the restriction on Plaintiffs' right to engage in charitable solicitation on public streets and sidewalks;

b.     Whether the Safe Solicitation Act is a prior restraint on speech and, if so, whether it contains adequate procedural safeguards and Defendants can meet their burden to justify the restrictions on Plaintiffs' free speech rights;

c.     Whether Defendants can justify the application fee to obtain a permit by demonstrating that it is necessary to defray any administrative costs associated with processing permit applications;

d.     Whether the Safe Solicitation Act is overbroad; and

e.     Whether the Safe Solicitation Act is void for vagueness under the Due Process Clause.

**Typicality, Fed. R. Civ. P. 23(a)(3)**

87.     Plaintiffs' claims are typical of the claims of the proposed Class. They are based on the same factual circumstances, including the same causes of harm, the same legal theory, and the same remedy.

88.     Plaintiffs have suffered the same constitutional deprivations putative Class members have suffered or will suffer: they are all subject to a prior restraint on speech, told that they cannot exercise their First Amendment right to solicit charity without first getting permission from—and paying—Defendants, and face the threat of prosecution for soliciting charity without that permission. Because each is harmed in the same way, the requested relief would remedy that harm as to all Class members equally.

89.     Consequently, the named Plaintiffs and putative Class members seek to redress the same legal injuries, through the same legal theories common to the entire Class.

16

## Adequacy, Fed. R. Civ. P. 23(a)(4) and 23(g)

90.    Plaintiffs will fairly and adequately protect the interests of the Class as required by Rule 23(a)(4).

91.    Plaintiffs are willing and able to represent the Class. They have agreed to serve as plaintiffs individually and to be active in the litigation on behalf of their fellow absent Class members.

92.    No potential exists for conflicts of interest between the proposed Class representatives and putative Class members.

93.    Plaintiffs' and Class members' claims rest upon the same constitutional injuries caused by Defendants Luckey's and Tindell's application of the challenged Act.

94.    Plaintiffs and Class members share a common interest in reforming Defendant Luckey's and Tindell's application of the Act.

95.    Plaintiff's counsel will fairly and adequately represent the interests of the class pursuant to Rule 23(g).

96.    Plaintiffs' counsel are qualified and prepared to pursue this action on behalf of the proposed Class.

97.    The attorneys representing Plaintiffs and the putative Class are experienced in handling class actions and civil rights litigation and have knowledge of, and experience litigating legal claims concerning unlawful policies and practices in state court systems.

98.    Additionally, Class counsel have sufficient financial and human resources to litigate this matter.

## Fed. R. Civ. P. 23(b)(2)

99.    Defendants Luckey and Tindell have acted on grounds generally applicable to the Class, making declaratory relief with respect to the Class as a whole appropriate and necessary.

100.    All putative Class members face the same harms: they are all subject to a prior restraint on speech, told that they cannot exercise their First Amendment right to solicit charity without first getting permission from—and paying—Defendants, and face the threat of prosecution for soliciting charity without that permission. Because each is harmed in the same way, the requested relief would remedy that harm as to all Class members equally.

101.    An order declaring that the Act is unconstitutional would remedy that harm.

## CLAIMS

### Count I: First Amendment – Free Speech (All Defendants)

102.    Plaintiffs restate and incorporate all foregoing paragraphs as though fully set forth herein.

103.    The First Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, prohibits the State from "abridging the freedom of speech."

104.    Charitable solicitation is constitutionally protected speech, and public streets and sidewalks are traditional public fora.

105.    The Act is content-based and fails strict scrutiny. It criminalizes charitable solicitation and commercial solicitation, but it does not criminalize solicitation for things that do not have financial value or things whose financial value is not easily quantifiable. This is a content-based restriction on speech because the Act restricts speech based on the topic and subject matter of the solicitation.

18

106.    Even if the Act were content-neutral, it would fail under intermediate scrutiny. Defendants cannot meet their burden to show narrow tailoring: the Act outlaws charitable solicitation on all public streets and sidewalks statewide, regardless of whether the street is a busy highway or residential throughway, despite state statutes that already prohibit people from interfering with or obstructing traffic. Defendants also cannot demonstrate that the Act leaves open ample alternative channels for communication.

107.    The Act is an unconstitutional prior restraint on speech that lacks required procedural safeguards. It contains no time limits on issuing permits, gives Defendants unbridled discretion to grant or deny a solicitation permit, requires unnecessary permit fees, and violates Plaintiffs' rights to engage in anonymous and spontaneous speech.

108.    The Act is unconstitutionally overbroad. The law sweeps substantial amount of protected speech activity into its ambit. It bars Plaintiffs and all other persons from engaging in protected speech—charitable solicitation—on traditional public fora without a permit.

**Count II: Fourteenth Amendment – Due Process – Vagueness (All Defendants)**

109.    Plaintiffs restate and incorporate all foregoing paragraphs as though fully set forth herein.

110.    The Fourteenth Amendment's Due Process Clause prohibits the State from depriving "any person of life, liberty, or property, without due process of law."

111.    The Act is unconstitutionally vague under the Due Process Clause.

112.    The Act is so indefinite that it allows for arbitrary and discriminatory enforcement. The Act provides inadequate guidance to local jurisdictions about how to enforce the prior restraint on speech, leaving jurisdictions across the State to enforce it in disparate and inconsistent ways.

19

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask that the Court enter judgment in their favor and:

A.    Assume jurisdiction over this action;

B.    Certify a Class under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure represented by Plaintiffs Brittany Black, Preston Owens, and Rachel Wright;

C.    Declare that the Act is unconstitutional under the First and Fourteenth Amendments;

D.    Preliminarily and permanently enjoin Defendants' enforcement and implementation of the Act;

E.    Award Plaintiffs their attorneys' fees and costs;

F.    Retain jurisdiction over this matter until Defendants have complied with all Orders that the Court may deem necessary; and

G.    Grant such other and further relief that the Court deems just and proper.

Dated: May 27, 2026                              Respectfully submitted,

                                                 s/ *Joshua Tom*
                                                 Joshua Tom
                                                   MS Bar No. 105392
                                                 AMERICAN CIVIL LIBERTIES
                                                   UNION OF MISSISSIPPI
                                                 P.O. Box 1142
                                                 Jackson, MS 39225
                                                 (601) 354-3408 (tel.)
                                                 (601) 355-6465 (fax)
                                                 jtom@aclu-ms.org

                                                 Attorney for Plaintiffs

20

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2026, I electronically filed the foregoing with the Clerk of the Court using the ECF system. I hereby certify that I have sent the document to Lynn Fitch, Mississippi Attorney General, by process server at the Walter Sillers Building, 550 High Street, Jackson, MS 39201.

Dated: May 27, 2026

s/ *Joshua Tom*
Joshua Tom