# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

| | |
|---|---|
| BRITTANY BLACK, PRESTON OWENS, and RACHEL WRIGHT, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No. |
| | Class Action |
| BO LUCKEY, in his official capacity as Chief of the Capitol Police, a unit of the Mississippi Department of Public Safety; and SEAN TINDELL, in his official capacity as Commissioner of the Mississippi Department of Public Safety, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>

## I.      INTRODUCTION

Plaintiffs Brittany Black, Preston Owens, and Rachel Wright, on behalf of themselves and the putative Class, seek a declaration that Mississippi's Safe Solicitation Act ("the Act"), *see* Miss. Code § 17-31-1, et seq., which makes it illegal to solicit charity without a permit, violates the First and Fourteenth Amendment on its face and as applied to them. The Act is a content-based restriction on protected speech (charitable solicitation) in traditional public fora (sidewalks and streets), and Defendants cannot meet their burden under strict scrutiny. The Act also violates the First Amendment because it is a prior restraint on speech with inadequate procedural protections, and because it is unconstitutionally overbroad. The Act violates Due Process because the Act is so indefinite that it allows for arbitrary and discriminatory enforcement.

Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (g), Plaintiffs Brittany Black, Preston Owens, and Rachel Wright, seek to certify a Class defined as:

> All persons who currently or will in the future solicit as defined in Miss. Code § 17-31-3(b) within the jurisdiction of the Capitol Police.

For the reasons discussed below, this Court should grant Plaintiffs' Motion, the proposed Class should be certified, and the case should proceed as a class action under Rule 23.[1]

## II.      STATEMENT OF FACTS

### A.      More than 1,000 Mississippians experience homelessness each year.

In 2024, an estimated 1,041 people experienced homelessness in the State of Mississippi, a six percent increase from 2023.[2] An estimated 167 of those people were families with children

---

[1] Plaintiffs request oral argument on their motion for class certification because oral argument will aid the Court's class certification decision.

[2] Tanya de Sousa and Meghan Henry, U.S. Department of Housing and Urban Development, *The 2024 Annual Assessment Report (AHAR) to Congress* 77 (Dec. 2024), https://www.huduser.gov/portal/sites/default/files/pdf/2024-AHAR-Part-1.pdf.

and 40 were veterans.[3] About 47 percent of people experiencing homelessness in 2024 were unsheltered, the country's twelfth highest percentage.[4] And about 48 percent of veterans experiencing homelessness were unsheltered, tied for the country's fifth highest percentage.[5]

According to the City of Jackson's Mayor, the City "has the highest number of individuals experiencing homelessness in the state."[6] As of January 22, 2024, Jackson, Rankin, and Madison counties had 273 residents experiencing homelessness.[7] About 57 percent (155 out of 273) of the residents experiencing homelessness in those counties identified as Black.[8]

As discussed below, Plaintiffs are among those Mississippians experiencing homelessness and poverty. They wish to stand on public streets to request charity from others to meet their basic needs but are prohibited from doing so under the Act without first obtaining a permit.

### B. The Safe Solicitation Act facially restricts people experiencing homelessness from requesting charity without a solicitation permit.

In March 2025, the Mississippi Governor signed the Safe Solicitation Act, *see* 2025 Miss. Laws H.B. 1197(1), which is codified in Miss. Code §§ 17-31-1 through 17-31-11.[9]

The idea for the Act's permitting requirement came from Defendant Luckey during a 2024 House Capital City Revitalization Committee to "discuss homelessness and squatting within our

---

[3] *Id.*

[4] *Id.*; *see also* 76–79.

[5] *Id.* at 54.

[6] City of Jackson, Miss., *Functional Zero*, https://web.archive.org/web/20240414004505/https://jacksonms.gov/functional-zero/.

[7] HUD 2024 Continuum of Care Homeless Assistance Programs Homeless Populations and Subpopulations, Jackson/Rankin, Madison Counties (Jan. 22, 2024), https://files.hudexchange.info/reports/published/CoC_PopSub_CoC_MS-500-2024_MS_2024.pdf.

[8] *Id.*

[9] The Act also amends Miss. Code §§ 97-35-25, 97-35-23, and 45-1-19.

capital city and also statewide."[10] "What I would suggest," Luckey said, "and what I have mentioned in the past, is anybody who's gonna be asking for money needs to be subject to getting a permit."[11]

In 2025, Representative Shanda Yates introduced the Safe Solicitation Act. Seizing on Defendant Luckey's proposal, the Act makes it unlawful for any person to solicit in any municipality, county, or political subdivision in the State of Mississippi without a solicitation permit. The Act prohibits anyone in the State, in other words, from holding signs asking for charity without first receiving pre-approval from the government. Although Representative Yates testified on the House Floor that she heard from multiple people concerned about solicitation, she conceded that she had no empirical data that soliciting is a public or traffic safety problem.[12]

Following the enactment of the Safe Solicitation Act, a person who wishes to solicit must complete an application that includes the person's name, mailing address, telephone number, and the location and times the solicitation will take place. Miss. Code § 17-31-9(3). Because the Act only authorizes one permit for each intersection on any given day, the Act orders government officials to issue permits "on a first come," first serve "basis to those applicants who submit a completed application form." Miss. Code § 17-31-9(2).

The Act does not provide any guidance to constrain the government's discretion when deciding whether to approve or deny a solicitation permit. The Act also does not contain any

---

[10] MISS. LEGISLATURE, *Capital Revitalization Committee Hearing - Room 113, 30 October, 2024; 1:00 P.M.*, at 0:05–0:16 (YouTube, Oct. 30, 2024), https://tinyurl.com/4ret4hby.

[11] *Id.* at 31:06–31:17.

[12] MISS. LEGISLATURE, *MS House Floor - 30 January, 2025; 2:00 P.M.*, at 39:35–40:57 (YouTube, Jan. 30, 2025), https://tinyurl.com/4axy89af (Yates: "I don't have a specific piece of paper to give you." Representative Hines: "So the answer to my question is no. You have no data from any particular source to say that this is an issue, other than somebody having a verbal conversation about it.").

timeframe for when a solicitation permit must be approved or denied or contemplate a process for a person denied a solicitation permit to appeal that denial to a court or administrative tribunal. The Act leaves it up to each local government to develop their own permit applications and processes.

The Act further authorizes officials to charge up to $25 for each solicitation permit, regardless of the permit process's administrative costs, and does not contain an exception for people who are indigent and unable to pay the fee. *See* Miss. Code § 17-31-5(b).

Any person with a solicitation permit may not (1) impede traffic; (2) solicit in a "demanding or harassing manner;" or (3) "use any sound or voice-amplifying apparatus or device." Miss. Code § 17-31-7(2). Additionally, any person with a solicitation permit may only (1) enter or remain in a street, roadway, or thoroughfare while a traffic signal prohibits vehicular movement; (2) must remain within 100 feet of or from the intersection approved under the permit; and (3) may only solicit during daylight hours. *Id.*

If these restrictions are violated, the permit may be revoked. *Id.*

The Act authorizes the Capitol Police to issue solicitation permits within the confines of the Capitol Complex Improvement District. Miss. Code § 45-1-19(6)(c)(ii). The Act is binding in every county and municipality unless the county or municipality voted to opt out of the Act on or before January 1, 2026. Miss. Code § 17-31-11. The City of Jackson did not opt out and the Capitol Police, as a state agency, does not have discretion to opt out. *See id.*

### C.    The Capitol Police implements the Safe Solicitation Act.

The Department of Public Safety ("DPS"), through the Office of Capitol Police, has concurrent jurisdiction with the Jackson Police Department and Hinds County Sheriff's Department to enforce state criminal laws "within the boundaries of the City of Jackson,

4

Mississippi," Miss. Code § 45-1-19(6)(b), and "primary jurisdiction" to enforce state criminal laws "within the boundaries of the Capitol Complex Improvement District," Miss. Code § 45-1-19(6)(a).

The Safe Solicitation Act gives authority to Defendants "to issue solicitation permits" "within the boundaries of the Capitol Complex Improvement District." Miss. Code § 45-1-19(6)(c)(i). Consistent with that authority, Defendants have developed a solicitation application and solicitation permit to implement the Act. *See* Application, attached as Ex. B to the accompanying Motion for Class Certification; *see also* Solicitation Permit, attached as Ex. C.

Defendants' application requires applicants to disclose their name, address, telephone number, and the date and time when the applicant intends to solicit. *See* Ex. B. The application form also requires the applicant to identify whether he or she is affiliated with an organization. *Id.*

The application form requires applicants to pay a $25 application fee per day for each solicitation permit, the maximum amount authorized for a solicitation permit under Miss. Code § 17-31-5(b). *Id.* There is no exception for indigency if a person is unable to pay the fee. *Id.* The permit is good "for one day from 9 a.m. until one hour before sunset."[13]

The application form has a box for officials to indicate when the application was received and whether a permit was issued. *See* Application, Ex. B. The form does not, however, provide any guidance about what factors should guide officials' discretion when granting or denying a permit, impose a timeframe for when a decision must be made, or contemplate a process to appeal an adverse decision. *Id.* There are no other regulations or written policies to guide Defendants' discretion. The permit application is not on the Capitol Police's website, *see*

---

[13] *See* Nell Luter-Floyd, *Panhandlers Slow to Apply for Solicitation Permits; No Requests Made As of Yet*, Northside Sun (Feb. 27, 2026), attached as Ex. D.; *see* Ex. H, Declaration of L.E. JiBol ("JiBol Decl.") ¶ 4.

https://www.dps.ms.gov/capitol-police, and employees of the Capitol Police have expressed confusion about how to process requests. *See* Ex. H, JiBol Decl. ¶¶ 3–5.

The solicitation permit requires a "solicitor" to "possess this permit while engaging in solicitation activities." *See* Solicitation Permit, Ex. C. The permit further requires applicants to list their name, address, and telephone number. *Id.* It also requires the person to state the date, time, and location of when they intend to solicit. *Id.*

In practice, Defendant Luckey has instructed Capitol Police officers to stop and ask people they see panhandling if they have permits.[14] "Officers have the discretion," Defendant Luckey represented to one reporter, "to cite panhandlers for being in violation[15], what typically happens, tell them to move along and where to get a permit."[16]

Defendant Luckey's statements are consistent with what Plaintiffs and proposed Class members have experienced. For example, officers from the Capitol Police Department make the Plaintiffs leave the area in which they solicit almost every day that they hold their signs on public streets and sidewalks without obtaining a permit. *See* Ex. I, Declaration of Brittany Black Decl. ¶ 8 ("Black Decl."); Ex. J, Declaration of Preston Owens ¶ 8 ("Owens Decl."); Ex. K, Declaration of Rachel Wright Decl. ¶ 9 ("Wright Decl."). The officers tell them to get a job and that they will arrest them if they continue to hold their signs, yell at them over loudspeakers, curse them, and flash their blue lights at them until they leave the area. *See* Ex. I, Black Decl. ¶ 9; Ex. J, Owens Decl. ¶ 9; Ex. K, Wright Decl. ¶ 10. Plaintiffs have witnessed the officers interact the same way

---

[14] Luter-Floyd Article, Ex. D.

[16] *Id.*

with others while they solicit help. *See* Ex. I, Black Decl. ¶ 9; Ex. J, Owens Decl. ¶ 9; Ex. K, Wright Decl. ¶ 10.

Defendants have cited at least one individual for violating the Safe Solicitation Act under Miss. Code. Ann. § 97-35-23 by "obstruct[ing] the public streets [and] roadways at State and High Street for the sole purpose of panhandling without a permit." *See* Affidavit, attached as Ex. E; *see also* Miss. Code. § 97-35-23 (exempting solicitation with a permit only from obstruction offense). Defendants have issued approximately 30 solicitation permits since March 10, 2026. *See* Permit Log, attached as Ex. F.

**D.      Plaintiffs Face Prosecution for Soliciting Charity Without a Permit.**

The plaintiffs are all homeless residents of Jackson. *See* Ex. I, Black Decl. ¶ 1; Ex. J, Owens Decl. ¶ 1; Ex. K, Wright Decl. ¶ 1. They all hold signs along public roadways in Jackson to get money and other items to meet their basic needs. *See* Black Decl. ¶ 2; Owens Decl. ¶ 2; Wright Decl. ¶ 2. They are all indigent and cannot afford the $25 per day fee for a permit. *See* Black Decl. ¶ 3; Owens Decl. ¶ 3; Wright Decl. ¶ 3. They all intend to hold signs indefinitely. *See* Black Decl. ¶ 5; Owens Decl. ¶ 5; Wright Decl. ¶ 5. They all have chosen the location in which they hold signs intentionally to see enough people to communicate that they are hungry and homeless, and because there are safe places to stand. *See* Black Decl. ¶ 6; Owens Decl. ¶ 6; Wright Decl. ¶ 6. They have all had interactions with the Capitol Police as described above. *See* Black Decl. ¶ 9; Owens Decl. ¶ 9; Wright Decl. ¶ 10. As a result of these interactions, they are all concerned about holding their signs and sometimes do not to avoid negative interactions with Defendants, but they believe they have no choice but to continue to do so to meet their daily needs. Black Decl. ¶ 12; Owens Decl. ¶ 12; Wright Decl. ¶ 13. Plaintiffs are participating in the lawsuit to vindicate their constitutional rights and the constitutional rights of other Class members. *See* Black Decl. ¶ 13; Owens Decl. ¶

13; Wright Decl. ¶ 13. They want to help themselves and other people who are similarly situated as them. *See id*

### III.    ARGUMENT

#### A.    Legal Standard

To be certified, the proposed Class must meet the requirements of Rule 23(a). *See* Fed. R. Civ. P. 23(a). Pursuant to Rule 23(a), a party seeking class certification must demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)–(4). These four class action prerequisites—known respectively as numerosity, commonality, typicality, and adequacy—"must be read liberally in the context of civil rights suits." *Jones v. Diamond*, 519 F.2d 1090, 1099 (5th Cir. 1975), *abrogated on other grounds by Gardner v. Westinghouse Broadcasting Co.*, 437 U.S. 478 (1978); *see also J.D. v. Nagin*, 255 F.R.D. 406, 414 (E.D. La. 2009) (same).

The class action must also fall within at least one of the three categories established in Rule 23(b), including the category pleaded here: "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2) (citation modified). If these requirements are met, certification of a class action will serve important public purposes, including "promoting judicial economy and efficiency" and "afford[ing] aggrieved persons a remedy [that may not otherwise be] . . . feasible to obtain . . . through the traditional framework of multiple individual . . . actions." 5 James Wm. Moore et al., Moore's Federal Practice § 23.02 (3d ed. 1999).

"[D]istrict court[s] maintain[] substantial discretion in determining whether to certify a class . . . ." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998). The court must "look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012) (citation and quotation marks omitted). However, "Rule 23[] grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* Thus, "[a]n evaluation of the probable outcome on the merits is not properly part of the certification decision." *Id.* (quoting Advisory Committee's 2003 Note on subd. (c)(1) of Fed. R. Civ. P. 23).

### B.  Rule 23(a)(1): Joinder is impracticable.

The first Rule 23(a) requirement is numerosity. Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

To satisfy numerosity, "joinder need not be impossible, merely impracticable." *Bywaters v. United States*, 196 F.R.D. 458, 466 (E.D. Tex. 2000). There are "no mechanical rules" courts must apply. *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992). A court "must not focus on sheer numbers alone but must instead focus on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors." *Pederson v. La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000) (citation and internal quotation marks omitted).

Rule 23(a)(1) "does not require the plaintiff to establish the exact number of potential class members." *Chauvin v. Chevron Oronite Co., LLC,* 263 F.R.D. 364, 368 (E.D. La. 2009) (citing *Bywaters*, 196 F.R.D. at 465). However, "a plaintiff must ordinarily demonstrate some evidence

9

or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (citing S3B J. Moore and J. Kennedy, Moore's Federal Practice § 23.05(3) (1980)). Although there is no minimum number at which joinder becomes impracticable, a class of more than 40 members "should raise a presumption that joinder is impracticable." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (quoting 1 Newberg on Class Actions § 3.05, at 3–25 (3d ed. 1992)). Moreover, "where the numerosity question is a close one, a balance should be struck in favor of a finding of numerosity, since the court has the option to decertify pursuant to Rule 23(c)(1)." *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983).

In this case, joinder of all proposed Class members is impracticable. According to recent estimates, there are over 273 residents of the City of Jackson (and Rankin and Madison Counties[17]) experiencing homelessness each night.[18] Because many face difficulties maintaining stable employment while experiencing homelessness, many of these individuals will at some point solicit to meet their basic needs, putting them at risk of prosecution. Additionally, between July 2025 when the Act went into effect and March 2026, the Capitol Police received 106 calls[19]. Many putative Class members have already come into contact—and will continue to come into contact— with Defendants, who are charged with enforcing the Act.

---

[17] HUD 2024 Continuum of Care Homeless Assistance Programs Homeless Populations and Subpopulations, Jackson/Rankin, Madison Counties (Jan. 22, 2024), https://files.hudexchange.info/reports/published/CoC_PopSub_CoC_MS-500-2024_MS_2024.pdf.

[18] HUD 2024 Continuum of Care Homeless Assistance Programs Homeless Populations and Subpopulations, Jackson/Rankin, Madison Counties (Jan. 22, 2024), https://files.hudexchange.info/reports/published/CoC_PopSub_CoC_MS-500-2024_MS_2024.pdf.

[19] *See* Capitol Police Call logs, attached as Ex. G.

The Court should also take into consideration other relevant characteristics of the putative Class in determining whether joinder is impracticable. As an initial matter, "Rule 23(a) must be read liberally in the context of civil rights suits." *Jones*, 519 F.2d at 1099; *see also id.* at 1100 ("general rule encouraging liberal construction of civil rights class actions applies with equal force to the numerosity requirement of Rule 23(a)(1)"). Moreover, joinder is "certainly impracticable" when a party seeks forward-looking relief such that future class members are "unnamed" and "unknown." *Jack v. Am. Linen Supply Co.*, 498 F.2d 122, 124 (5th Cir. 1974) (per curiam); *see also Pederson*, 213 F.3d at 868 n.11 (same) ("We have found the inclusion of future members in the class definition a factor to consider in determining if joinder is impracticable."); *Jones*, 519 F.2d at 1100 ("Smaller classes are less objectionable where . . . the plaintiff is seeking injunctive relief on behalf of future class members as well as past and present members.").

Additionally, joinder is impracticable where class members are experiencing poverty or face other barriers to filing their own lawsuits. *See Pitts v. Greenstein*, No. 10-635, 2011 WL 2193398, at *4 (M.D. La. June 6, 2011) (numerosity satisfied because "proposed class members face severe financial hardship" and "lack the financial resources necessary to bring suit individually . . . to vindicate their rights"); *Singleton v. Taylor*, No. 2:20-CV-99-WKW, 2021 WL 5227063, at *4 (M.D. Ala. Nov. 8, 2021) ("In this case, where the plaintiffs are necessarily indigent and likely homeless, the class action mechanism provides stability, protection against mootness, and ensures that the action can continue should a named plaintiff go missing. That is value enough for class certification."); *Indiana Civil Liberties Union Found., Inc. v. Superintendent*, No. 1:20-CV-01094, 2020 WL 3579555, at *5 (S.D. Ind. June 30, 2020) (finding joinder impracticable in class action challenging panhandling laws because "the class spans the entire state, and because it

11

is reasonable to infer that those who are engaging in panhandling may not have the ability to sue Defendants individually").

Here, each of these additional factors supports finding that joinder is impracticable and numerosity is satisfied. The putative Class members, most of whom are unknown and unnamed individuals who are experiencing homelessness, seek to vindicate the violation of their civil rights and have only requested forward-looking declaratory and injunctive relief. Complaint ¶¶ 102–112. And most—if not all—of the Class members are low-income individuals who would face barriers to filing their own individual lawsuits. Ex. I, Black Decl. ¶ 3; Ex. J, Owens Decl. ¶ 3; Ex. K, Wright Decl. ¶ 3.

For these reasons, joinder would be impracticable, and the numerosity requirement of Rule 23(a)(1) is met.

C.      **Rule 23(a)(2): The proposed class shares common questions of law and fact.**

The second Rule 23(a) requirement is commonality. The proposed class satisfies the requirement that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "To satisfy the commonality requirement under Rule 23(a)(2), class members must raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014). "[C]ommonality requires more than a shared cause of action or common allegation of fact—it requires a common legal contention capable of class-wide resolution[.]" *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 767 (5th Cir. 2020). "Even a single common question of law or fact can suffice to establish commonality, so long as resolution of that question 'will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke.'" *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

"The threshold of commonality is not high." *Vine v. PLS Fin. Servs., Inc.*, 331 F.R.D. 325, 332 (E.D. Tex. 2019) (quoting *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986)). By their nature, civil rights cases often easily demonstrate commonality because the defendants' actions are "central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct." *Baby Neal for & by Kanter v. Casey*, 43 F. 3d 48, 57 (3d Cir. 1994) (citing 7A Charles A Wright, et al., Fed. Prac. & Proc. § 1763 at 219 (2d Ed. 1986)); *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 653 (S.D. Fla. 2012) (common questions about whether defendant's "uniform application" of policy, "as applied to all of customers in the same way, was unlawful" satisfied requirement of commonality).

Although there need only be common issues of law <u>or</u> fact under Rule 23(a), this case presents numerous issues of both law <u>and</u> fact that affect putative Class members and are capable of class-wide resolution. The common questions of fact this case presents include:

1. Whether Defendants condition the exercise of Plaintiffs' and the putative Class's First Amendment rights on obtaining a solicitation permit from Defendants;
2. Whether the permit process gives discretion to Defendants to grant or deny solicitation permits to Plaintiffs and the putative Class and, if so, what criteria, if any constrain that discretion;
3. Whether Plaintiffs and the putative Class are required to pay an application fee to obtain a solicitation permit and the cost of that permit;
4. What administrative costs, if any, are associated with processing solicitation permit applications;
5. Whether Defendants have established any deadlines for approving or denying a solicitation permit and a process for appealing the denial of a permit application;
6. The reasons, if any, for requiring Plaintiffs and the putative Class to obtain a solicitation permit before exercising their First Amendment rights to engage in charitable solicitation; and
7. Whether Defendants prosecute, threaten to prosecute, or order individuals to move along for standing on public streets and soliciting financial assistance without a solicitation permit.

Common questions of law presented in this case include:

1. Whether the Safe Solicitation Act infringes on constitutionally protected speech under the First Amendment and whether the government can meet its burden to

13

justify the restriction on Plaintiffs' right to engage in charitable solicitation on public streets and sidewalks;

2. Whether the Safe Solicitation Act is a prior restraint on speech and, if so, whether it contains adequate procedural safeguards and Defendants can meet their burden to justify the restrictions on Plaintiffs' free speech rights;

3. Whether Defendants can justify the application fee to obtain a permit by demonstrating that it is necessary to defray any administrative costs associated with processing permit applications;

4. Whether the Safe Solicitation Act is overbroad; and

5. Whether the Safe Solicitation Act is void for vagueness under the Due Process Clause.

Resolution of any of these common questions of law or fact will serve as the "glue" uniting the Class's factual and legal claims and will provide "a common answer to the crucial question" of whether the statutory provisions challenged cause constitutional injuries to the Plaintiffs and the putative Class members. *See Dukes*, 564 U.S. at 352.

Moreover, this case presents a typical example of where commonality is satisfied—when a plaintiff challenges a statute or an entity's generally applicable policies. *See M.D. ex rel. Stukenberg*, 675 F.3d at 847 (holding "a pattern or practice of agency action or inaction—including a failure to correct a structural deficiency within the agency"—was sufficient to satisfy commonality); *Johnson v. Am. Credit Co. of Georgia*, 581 F.2d 526, 532 (5th Cir. 1978) (challenge to Georgia prejudgment attachment statute satisfied commonality); *Johnson v. Mississippi*, 78 F.R.D. 37, 39 (N.D. Miss. 1977) (facial and as-applied challenge to statute's constitutionality satisfied commonality). Thus, because there are multiple questions of law and fact that each "will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke," *Ibe*, 836 F.3d at 528 (quoting *Dukes*, 564 U.S. at 350), the commonality requirement of Rule 23(a)(2) is met.

14

**D.      Rule 23(a)(3): Plaintiffs' claims are typical of the Class.**

The third Rule 23(a) requirement is typicality. "Rule 23(a)(3) provides that 'the claims or defenses of the representative parties [must also be] typical of the claims or defenses of the class.'" *Ibe*, 836 F.3d at 528 (quoting Fed. R. Civ. P. 23(a)(3)). "The typicality inquiry rests 'less on the relative strengths of the named and unnamed plaintiffs' cases than on the similarity of legal and remedial theories behind their claims.'" *Id.* at 528–29 (quoting *Jenkins*, 782 F.2d at 472).

"Like commonality, the test for typicality is not demanding." *Mullen*, 186 F.3d at 625. "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 736 (5th Cir. 2023) (quoting *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002)). If the same course of conduct affects both the named representative and the putative class members, typicality is met even if the fact patterns underlying individual claims vary. *See Mullen*, 186 F.3d at 625. "[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Baby Neal*, 43 F.3d at 58.

Plaintiffs' claims are typical of the claims of the Class as a whole. Plaintiffs and the putative Class members have suffered the same injury to their First and Fourteenth Amendment rights because of the Safe Solicitation Act. They are all subject to a prior restraint on speech and told that they cannot request charity without first getting permission from the government and that, if they do, they face criminal prosecution. Defendants have ordered them to cease soliciting charity until they first request and obtain a permit. Plaintiffs have complied with Defendants' orders to move along from public places. Defendants, for example, have threatened Plaintiffs with arrest if they continue to hold their signs, yelled at them over loudspeakers, cursed them, and flashed their blue lights until they stop soliciting charity. *See* Ex. I, Black Decl. ¶ 9; Ex. J, Owens Decl. ¶ 9; Ex. K,

15

Wright Decl. ¶ 10. The answer to whether this law is unconstitutional will determine the success of Plaintiffs' claims and the claims of every other proposed Class member. *See In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 420 (S.D. Tex. 1999) (quoting 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.13 (3rd ed. 1992)) ("[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."). Therefore, if Plaintiffs succeed in establishing that the Act violates their constitutional rights, that ruling will benefit every other member of the proposed Class.

Both the named Plaintiffs and putative Class members seek to redress common legal injuries through the identical legal theories common to the Class. For these reasons, Plaintiffs meet the Rule 23(a)(3) requirement of typicality.

> **E.     Rule 23(a)(4) and 23(g): Plaintiffs will adequately represent the Class, and undersigned counsel are qualified to serve as class counsel.**

The fourth Rule 23(a) requirement is adequacy of the named plaintiffs, and Rule 23(g) requires adequacy of class counsel. Rule 23 requires a court to evaluate "[1] the zeal and competence of the representatives' counsel and [2] the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees." *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 479 (5th Cir. 2001) (citation modified). "The adequacy inquiry also 'serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent.'" *Id.* at 479–80 (quoting *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).

As one court explained, Rule 23(a)(4) is not an "exacting" standard; "it is sufficient that class representatives have a general understanding of their position as plaintiffs with respect to the cause of action and the alleged wrongdoing perpetrated against them by the defendants." *Steward*

16

*v. Janek*, 315 F.R.D. 472, 490 (W.D. Tex. 2016) (citation modified). "[C]lass representatives need not be legal scholars," *Berger*, 257 F.3d at 483, who "understand all of the legal technicalities at issue in this case," *In re Rodriguez*, 432 B.R. 671, 699 (Bankr. S.D. Tex. 2010), *aff'd*, 695 F.3d 360 (5th Cir. 2012). Courts have found that class representatives are adequate if they convey that their role is "to fight for" people, "[w]atch[] out for others" and "not simply protect[] one's own interests," and "keep in touch with everything that's going on," including "talking to [their] lawyers." *See id*. at 698 (citation modified).

Plaintiffs are participating in the lawsuit to vindicate their constitutional rights and the constitutional rights of other Class members. *See* Ex. I, Black Decl. ¶ 13; Ex. J, Owens Decl. ¶ 13; Ex. K, Wright Decl. ¶ 14. They want to help themselves and other people who are similarly situated as them. *See id.* In short, the named Plaintiffs understand how they have been wronged, their legal claims, and their role as class representatives. *See id.* That is sufficient to satisfy adequacy.

No potential exists for conflicts of interest between the named Plaintiffs and the Class. Where, as here, a plaintiff's claims "rest upon the practices and policies" of the defendants—that is, implementing and enforcing a prior restraint on speech—and there is a "common interest[]" of reforming those practices and policies, no conflict exists. *J.D.*, 255 F.R.D. at 416; *see also Neff v. VIA Metro. Transit Auth.*, 179 F.R.D. 185, 195 (W.D. Tex. 1998) (broad-based relief sought to improve public transportation system is in the interest of all disabled class members). The ongoing threat of future enforcement by Defendants equally affects Plaintiffs and putative Class members. *See Pottinger v. City of Miami*, 720 F Supp. 955, 959 (S.D. Fla. 1989) (noting that, for adequacy purposes, whether named Plaintiffs had been arrested by law enforcement was "immaterial since the class [was] defined in terms of those homeless persons who 'have been arrested *or* expect to be arrested'"). Plaintiffs' interests in the vindication of the legal claims that they raise are

17

completely aligned with the interests of the other Class members. No member of the putative Class would be harmed by the requested relief, which would allow both Plaintiffs and Class members to exercise the same First and Fourteenth Amendment freedoms without fear of arrest or citation.

Finally, Plaintiffs' counsel is fully qualified and prepared to pursue this action on behalf of the proposed Class as required by Rule 23(g). *See* Ex. A, Declaration of Joshua Tom ("Tom Decl.") ¶¶ 8–21. Class counsel are experienced civil rights and class action attorneys, who have extensive knowledge about and experience litigating legal claims concerning unlawful policies and practices. *See id.* Additionally, Class counsel has sufficient financial and human resources to litigate this matter. *Id.* ¶ 20. In sum, Plaintiffs' attorneys are experienced advocates; possess "the zeal and competence" necessary to pursue the Class interests; and have sufficient resources to adequately prosecute this action. *See Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005) (citation modified).

**F.      Rule 23(b)(2): Defendants Luckey and Tindell act uniformly toward members of the proposed Class, and declaratory and injunctive relief on behalf of the Class is appropriate.**

The putative Class also satisfies the requirements of Rule 23(b)(2). Rule 23(b)(2) provides for class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P 23(b)(2). "It is well-established that '[i]nstead of requiring common issues, [Rule] 23(b)(2) requires common behavior by the defendant toward the class.'" *Yates v. Collier*, 868 F.3d 354, 366 (5th Cir. 2017) (quoting *Rodriguez*, 695 F.3d at 365). Thus, "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or

declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc.*, 564 U.S. at 360 (citation modified).

Lawsuits, like this one, brought for equitable relief that allege civil rights violations are precisely the type of suit for which Rule 23(b)(2) was intended to provide class certification. *See Amchem*, 521 U.S. at 614 ("Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of where class certification is proper under Rule 23(b)(2)); *Jones*, 519 F.2d at 1100 ("[T]he 23(b)(2) class action is an effective weapon for an across-the-board attack against systematic abuse."). "[S]ome courts have gone so far as to say that the rule's requirements are 'almost automatically satisfied in actions primarily seeking injunctive [or declaratory] relief.'" *Dunn v. Dunn*, 318 F.R.D. 652, 667 (M.D. Ala. 2016) (quoting *Baby Neal*, 43 F.3d at 58).

This case squarely meets the requirements of Rule 23(b)(2), as the requested declaratory relief "would provide relief to each member of the class." *Wal-Mart Stores, Inc.*, 564 U.S. at 360. All putative Class members face the same harm under the Act: infringement of their First Amendment right to solicit charity and the risk of arbitrary and discriminatory enforcement in violation of the Fourteenth Amendment. Because each Class member is harmed in the same way, the requested relief would remedy that harm as to all named and unnamed Class members equally. *See Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007). A declaration that the Act violates the First and Fourteenth Amendments and an injunction preventing its enforcement would remedy that harm. Because the relief sought "affect[s] the entire class at once," the requirements of Rule 23(b)(2) are met. *Wal-Mart Stores, Inc.*, 564 U.S. at 361–62.

19

## IV.    CONCLUSION

For these reasons, Plaintiffs Black, Owens, and Wright respectfully request that the Court schedule oral arguments on their Motion for Class Certification, grant the Motion, certify the proposed Class pursuant to Rule 23(a), 23(b)(2), and 23(g), and allow the case to proceed as a class action under Rule 23.

Dated: May 27, 2026

Respectfully submitted,

/s/ *Joshua Tom*
Joshua Tom
  MS Bar No. 105392
AMERICAN CIVIL LIBERTIES
  UNION OF MISSISSIPPI
P.O. Box 1142
Jackson, MS 39225
(601) 354-3408 (tel.)
(601) 355-6465 (fax)
jtom@aclu-ms.org

Attorney for Plaintiffs

**<u>CERTIFICATE OF SERVICE</u>**

Undersigned counsel does hereby certify that on this date, a true and correct copy of the above and foregoing has been filed with the Clerk of the Court via the Court's electronic filing system, and notification of such filing was sent to all counsel of record via same.

Dated: May 27, 2026                                /s/ *Joshua Tom*
                                                           Joshua Tom

21