**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| BRITTANY BLACK, PRESTON OWENS, and RACHEL WRIGHT, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BO LUCKEY, in his official capacity as Chief of the Capitol Police, a unit of the Mississippi Department of Public Safety; and SEAN TINDELL, in his official capacity as Commissioner of the Mississippi Department of Public Safety,<br><br>Defendants. | Case No.  3:26-cv-377-DPJ-MTP<br><br>Class Action<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

## I.    INTRODUCTION

Plaintiffs are three homeless Jackson, Mississippi residents who hold signs on public streets and sidewalks soliciting help. They challenge on behalf of themselves and a putative Class Mississippi's Safe Solicitation Act, Miss. Code § 17-31-1 et seq., on its face and as applied under the First and Fourteenth Amendments. The Act makes it unlawful to solicit (1) "money or anything of value as a donation or contribution" or (2) "any other thing of value in exchange for any goods, wares, merchandise or thing of value" without a solicitation permit. Miss. Code §§ 17-31-3(b), 5(1). Defendants Bo Luckey, the Capitol Police Chief, and Sean Tindell, the Commissioner of the Mississippi Department of Public Safety, have used the law to cite or issue move along orders to Plaintiffs and others for holding signs with messages such as: "hungry, homeless, anything helps."

Plaintiffs are entitled to a preliminary injunction because the Act is a content-based restriction on their protected speech (charitable solicitation) in traditional public fora (public streets and sidewalks). Defendants cannot meet their burden under strict scrutiny. But, even if this Court concludes that the law is content-neutral, Plaintiffs are still likely to succeed on the merits because Defendants cannot demonstrate that the law is narrowly tailored to meet a substantial state interest or that the Act leaves open ample, alternative channels of communication.

The Act also violates the First Amendment because it is a prior restraint on speech with inadequate procedural protections. The Act (1) gives Defendants unbridled discretion to approve or deny a solicitation permit; (2) provides no opportunity for prompt judicial review if an application is denied; (3) requires applicants to pay up to $25 per day to obtain a permit that has no relationship to the administrative costs associated with processing solicitation permits; and (4) violates Plaintiffs' right to engage in spontaneous and anonymous speech.

Plaintiffs are also likely to succeed on the merits that the Act is void for vagueness under the Due Process Clause because it fails to provide sufficient guidance to local governments to avoid arbitrary and discriminatory enforcement of the permitting scheme.

Plaintiffs suffer irreparable harm because the Act infringes on their First and Fourteenth Amendment right to ask for help to meet their basic needs. An injunction will serve the public interest, and the threatened injury to Plaintiffs outweighs any harm to Defendants.

## II.    FACTUAL BACKGROUND

### A.    The Safe Solicitation Act facially restricts people experiencing homelessness from requesting charity without a solicitation permit.

In March 2025, the Mississippi Governor signed the Safe Solicitation Act, *see* H.B. 1197 (Miss. 2025), which is codified in Miss. Code §§ 17-31-1 through 17-31-11.[1]

The idea for the permitting process came from Defendant Luckey during a 2024 House Capital City Revitalization Committee to "discuss homelessness and squatting within our capital city and also statewide."[2] "What I would suggest," Luckey said, "and what I have mentioned in the past, is anybody who's gonna be asking for money needs to be subject to getting a permit."[3]

In 2025, Representative Shanda Yates introduced the Safe Solicitation Act. Seizing on Defendant Luckey's proposal, the Act makes it unlawful for any person to solicit in any municipality, county, or political subdivision in the State of Mississippi without a solicitation permit. The Act prohibits anyone in the State, in other words, from holding signs asking for charity without first receiving pre-approval from the government. Although Representative Yates testified

---

[1] The Act also amends Miss. Code §§ 97-35-25, 97-35-23, and 45-1-19.

[2] Miss. Legislature, *Capital Revitalization Committee Hearing - Room 113, 30 October, 2024; 1:00 P.M.*, at 0:05–0:16 (YouTube, Oct. 30, 2024), https://www.youtube.com/watch?v=T6cWjaYN2fY.

[3] *Id.* at 31:06–31:17.

on the House Floor that she heard from multiple people concerned about solicitation, she conceded that she had no empirical data that soliciting is a public or traffic safety problem.[4]

Following the enactment of the Safe Solicitation Act, a person who wishes to solicit must now complete an application that includes the person's name, mailing address, telephone number, and the location and times the solicitation will take place. Miss. Code § 17-31-9(3). Because the Act only authorizes one permit for each intersection on any given day, the Act orders government officials to issue permits "on a first come," first serve "basis to those applicants who submit a completed application form." *Id.* § 17-31-9(2).

The Act does not provide any guidance to constrain the government's discretion when deciding whether to approve or deny a solicitation permit. The Act also does not contain any timeframe for when a solicitation permit must be approved or denied or contemplate a process for a person denied a solicitation permit to appeal that denial to a court or administrative tribunal. The Act leaves it up to each local government to develop their own permit applications and processes.

The Act further authorizes officials to charge up to $25 for each solicitation permit, regardless of the permit process's administrative costs, and does not contain an exception for people who are indigent and unable to pay the fee. *See id.* § 17-31-5(2).

Any person with a solicitation permit may not (1) impede traffic; (2) solicit in a "demanding or harassing manner"; or (3) "use any sound or voice-amplifying apparatus or device." Miss. Code § 17-31-7(2). Additionally, any person with a solicitation permit may only (1) enter or remain in a street, roadway, or thoroughfare while a traffic signal prohibits vehicular movement;

---

[4] Miss. Legislature, *MS House Floor - 30 January, 2025; 2:00 P.M.*, at 39:35–40:57 (YouTube, Jan. 30, 2025), https://www.youtube.com/watch?v=6UqzrgMTe0g (Representative Shanda Yates: "I don't have a specific piece of paper to give you." Representative John W. Hines, Sr.: "So the answer to my question is no. You have no data from any particular source to say that this is an issue, other than somebody having a verbal conversation about it.").

(2) must remain within 100 feet of or from the intersection approved under the permit; and (3) may only solicit during daylight hours. *Id.*

If any of these restrictions are violated, the permit may be revoked. *Id*. § 17-31-7(3).

The Act authorizes the Capitol Police to issue solicitation permits within the confines of the Capitol Complex Improvement District, which is fully encompassed by Jackson. *Id.* § 45-1-19(6)(c)(ii). The Act is binding in every county and municipality unless the county or municipality voted to opt out of the Act on or before January 1, 2026. *Id.* § 17-31-11. The City of Jackson did not opt out, and the Capitol Police, as a state agency, cannot opt out.

### B.    The Capitol Police's implementation of the Safe Solicitation Act.

The Department of Public Safety ("DPS"), through the Office of Capitol Police, has concurrent jurisdiction with the Jackson Police Department and Hinds County Sheriff's Department to enforce state criminal laws "within the boundaries of the City of Jackson, Mississippi," Miss. Code § 45-1-19(6)(b), and "primary jurisdiction" to enforce state criminal laws "within the boundaries of the Capitol Complex Improvement District," *id.* § 45-1-19(6)(a), as defined in Miss. Code § 29-5-203.

The Safe Solicitation Act gives authority to Defendant Luckey "to issue solicitation permits" "within the boundaries of the Capitol Complex Improvement District." *Id.* § 45-1-19(6)(c)(ii). Consistent with that authority, Defendants have developed a solicitation application and solicitation permit to implement the Act. *See* Application, attached as Ex. A; *see also* Solicitation Permit, attached as Ex. B.

Defendants' application requires applicants to disclose their name, address, telephone number, and the date and time when they intend to solicit. *See* Application, Ex. A. The application form also requires the applicant to identify whether he or she is affiliated with an organization. *Id.*

4

The form requires applicants to pay a $25 application fee per day for each solicitation permit, the maximum amount authorized for a solicitation permit under Miss. Code § 17-31-5(2). There is no exception for indigency if a person is unable to pay the fee. *Id.* The permit is good "for one day from 9 a.m. until one hour before sunset."[5]

The application has a box for officials to indicate when the application was received and whether a permit was issued. *See* Application, Ex. A. The application form does not provide any guidance about what factors should guide officials' discretion when granting or denying a permit, impose a timeframe for when a decision must be made, or contemplate a process to appeal an adverse decision. There are no other regulations or written policies to guide Defendants' discretion. The permit application is not on the Capitol Police's website, *see Capitol Police*, Miss. Dep't of Pub. Safety, https://www.dps.ms.gov/capitol-police (last visited May 20, 2026), and employees of the Capitol Police have expressed confusion about how to process requests. *See* Ex. G, Declaration of L.E. JiBol ¶¶ 3–5 ("JiBol Decl.").

The solicitation permit itself requires a "solicitor" to "possess this permit while engaging in solicitation activities." *See* Solicitation Permit, Ex. B. The permit requires applicants to list their name, address, and telephone number. *Id.* It also requires them to state the date, time, and location of when and where they intend to solicit. *Id.*

In practice, Defendant Luckey has instructed Capitol Police officers to "stop[] and ask[] people they see panhandling if they have permits." Luter-Floyd Article, Ex. C. "Officers have the discretion," Defendant Luckey represented to one reporter, "to cite panhandlers for being in violation or, what typically happens, tell them to move along and where to get a permit." *Id.*

---

[5] *See* Nell Luter-Floyd, *Panhandlers Slow to Apply for Solicitation Permits; No Requests Made As of Yet*, Northside Sun (Feb. 27, 2026) ("Luter-Floyd Article"), attached as Ex. C; *see also* Ex., G, JiBol Decl. at ¶ 4 (noting that permits are good for "one day" "ending at sunset").

Defendant Luckey's statements are consistent with what Plaintiffs have experienced. For example, Capitol Police officers make the Plaintiffs leave the area in which they solicit almost every day that they hold their signs on public streets and sidewalks without obtaining a permit. *See* Ex. H, Declaration of Brittany Black Decl. ¶ 8 ("Black Decl."); Ex. I, Declaration of Preston Owens ¶ 8 ("Owens Decl."); Ex. J, Declaration of Rachel Wright Decl. ¶ 9 ("Wright Decl."). The officers tell them to get a job and that they will arrest them if they continue to hold their signs, yell at them over loudspeakers, curse them, and flash their blue lights until they leave the area. *See* Ex. H, Black Decl. ¶ 9; Ex. I, Owens Decl. ¶ 9; Ex. J, Wright Decl. ¶ 10. Plaintiffs have witnessed the officers interact in the same way with others while they solicit help. *See* Ex. H, Black Decl. ¶ 9; Ex. I, Owens Decl. ¶ 9; Ex. J, Wright Decl. ¶ 10.

Defendants have cited at least one individual for violating the Act by "obstruct[ing] the public streets [and] roadways at State and High Street for the sole purpose of panhandling without a permit." *See* Affidavit, attached as Ex. D. Defendants have issued about thirty permits since March 10, 2026. *See* Solicitation Permit Log, attached as Ex. E.

### C.    Plaintiffs face a credible threat of prosecution under the Act.

The Act chills Plaintiffs' right to engage in charitable solicitation under the First Amendment. A pre-enforcement challenge does not require exposure to actual arrest or prosecution where, as here, the statute chills the plaintiffs' speech. To establish this injury for purposes of standing, plaintiffs must show: "(1) an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) his intended future conduct is arguably proscribed by the policy in question and (3) the threat of future enforcement of the challenged policies is substantial." *LIA Network v. City of Kerrville*, 163 F. 4th 147, 157 (5th Cir. 2025) (quoting *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020)). The requirements are met here.

First, Plaintiffs have engaged in solicitation without a permit on streets and sidewalks to meet their daily needs, and they intend to continue to engage in solicitation indefinitely despite the Defendants' threats of arrest and move along orders. *See* Ex. H, Black Decl. ¶¶ 2, 5–9, 12; Ex. I, Owens Decl. ¶¶ 2, 5–9, 12; Ex. J, Wright Decl. ¶¶ 2, 6–10, 13; *see also Uzuegbunam v. Preczewski*, 592 U.S. 279, 283–84, 293 (2021) (plaintiff's compliance with law enforcement order to stop speaking without first obtaining a permit is complete violation for purposes of standing).

Second, soliciting on streets and sidewalks without a permit is prohibited by the Safe Solicitation Act. Miss. Code §§ 17-31-3(b), 5(1).

Third, the threat of future enforcement is substantial. Between July 2025 and March 2026, the Capitol Police responded to around 100 calls about solicitation. *See* Capitol Police Call Logs, attached as Ex. F. And Defendant Luckey himself conceded that "[o]fficers have the discretion to cite panhandlers for being in violation" of the Act—as they have done already on at least one occasion, *see* Affidavit, Ex. D—or order them "to move along." Luter-Floyd Article, Ex. C. Officers repeatedly tell Plaintiffs that they will arrest Plaintiffs if they continue to hold their signs, yell at Plaintiffs over loudspeakers, curse Plaintiffs, and flash their blue lights until they leave the area. *See* Ex. H, Black Decl. ¶ 9; Ex. I, Owens Decl. ¶ 9; Ex. J, Wright Decl. ¶ 10. Plaintiffs are afraid and concerned about holding their signs and sometimes choose not to do so because of the Capitol Police Department's threats of arrest and move along orders; however, Plaintiffs believe they have no choice but to continue to hold signs to solicit charity to meet their daily needs. *See* Ex. H, Black Decl. ¶¶ 11-12; Ex. I, Owens Decl. ¶¶ 11-12; Ex. J, Wright Decl. ¶¶ 12-13.

III.    ARGUMENT

        A.    **Legal Standard**

7

A preliminary injunction is proper if the plaintiff establishes: (1) a likelihood of success on the merits of one or more of his claims; (2) a likelihood that he will suffer irreparable harm; (3) that the balance of equities tips in his favor as the threatened injury outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Although a plaintiff generally "has the burden of proof on all elements," "in the First Amendment context, the burden on the first element shifts to the defendant." *LIA Network*, 163 F. 4th at 161. Thus, if a plaintiff demonstrates that "the government is infringing her speech," "she has presumptively carried her burden" of demonstrating a likelihood of success on the merits and "[t]he burden then shifts to the government to rebut the presumption by showing its ability to justify the statutes' constitutionality." *Id.* (citation modified).

For the below reasons, Plaintiffs satisfy the four elements for a preliminary injunction.

### B.    Plaintiffs are likely to succeed on the merits.

This Court should find that Plaintiffs are likely to succeed on the merits of their First and Fourteenth Amendment claims. The Safe Solicitation Act violates the First Amendment because it is a content-based restriction on speech and Defendants cannot meet their burden under strict scrutiny. But, even if this Court concludes that the law is content-neutral, Plaintiffs are still likely to succeed on the merits because Defendants cannot demonstrate that the law is narrowly tailored to meet a substantial state interest or that the Act leaves open ample, alternative channels of communication. The Act also violates the First Amendment because it is a prior restraint on speech and contains inadequate procedural protections. The Act is also void for vagueness under the Due Process Clause because it fails to provide sufficient guidance to local governments to prevent arbitrary and discriminatory enforcement of the permitting scheme.

### 1.    The Act restricts protected speech.

The Act restricts constitutionally protected speech—charitable solicitation—on its face. *See* Miss. Code § 17-31-3 (defining "solicitation" as any request for "money or anything of value as a donation or contribution"). It is well settled that charitable solicitation—whether for political, personal, religious, or charitable causes—is "protected by the First Amendment." *United States v. Kokinda*, 497 U.S. 720, 725 (1990) (plurality opinion) (citing *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 629 (1980)); *Riley v. Nat'l Fed'n of Blind of N.C, Inc.*, 487 U.S. 781, 788–89 (1988)).

*Schaumburg* is the seminal case. Summarizing a half-century of caselaw, *Schaumburg* held "that charitable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." 444 U.S. at 632. Although subject to "reasonable regulation," government may not categorially ban soliciting because "without solicitation the flow of [] information and advocacy would likely cease." *Id*.

The Fifth Circuit has broadly found that "[c]haritable solicitations are fully-protected speech." *Nat'l Fed'n of Blind of Tex., Inc. v. City of Arlington*, 109 F.4th 728, 733 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 1311 (2025); *see also LIA Network*, 163 F.4th at 163 ("The City does not dispute that Plaintiffs' intended conduct—political canvassing, street evangelism, charitable solicitation, and commercial solicitation—is protected speech."). And all eight federal circuit courts of appeal presented with the question have concluded that a person in need engages in protected speech when asking for charity.[6]

---

[6] *See, e.g., Cutting v. City of Portland*, 802 F.3d 79, 84 (1st Cir. 2015); *Loper v. New York City Police Dep't*, 999 F.2d 699, 704 (2d Cir. 1993); *Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir.

## 2.    The Act restricts speech in traditional public fora.

The Supreme Court has held that the government's ability to restrict speech in traditional public fora is "very limited" because public streets and sidewalks "occupy a special position in terms of First Amendment protection because of their historic role as sites for discussion and debate." *McCullen v. Coakley*, 573 U.S. 464, 476–77 (2014) (citation modified).

The Act restricts solicitation in traditional public fora—such as public streets and sidewalks—where First Amendment protections reach their zenith. The Act makes unlawful solicitation "on any road, street, highway median, traffic island or highway intersection" without a solicitation permit. Miss. Code § 17-31-3(b). Although the Act does not define "street," a leading treatise has explained that "[t]he term 'street' generally includes sidewalks, and the sidewalk constitutes a part of the street." 9A Am. Jur. Legal Forms 2d § 134:120. The text of the Act itself supports the conclusion that the Act restricts solicitation on both public streets and sidewalks: if a person fails to obtain a permit before soliciting, they can be charged with the crime of obstructing "the free, convenient and normal use of any public sidewalk." *See* Miss. Code § 97-35-25

---

2015); *Speet v. Schuette*, 726 F.3d 867, 877–78 (6th Cir. 2013); *Gresham v. Peterson*, 225 F.3d 899, 903–05 (7th Cir. 2000); *Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 945 (9th Cir. 2011) (en banc); *McCraw v. City of Okla. City*, 973 F.3d 1057, 1066 (10th Cir. 2020); *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999).

Every district court presented with this question in the Fifth Circuit has also found that charitable solicitation by persons in need is constitutionally protected speech. *See, e.g.*, *Henagan v. City of Lafayette*, No. 6:21-CV-03946, 2022 WL 4553055, at *4 (W.D. La. Aug. 16, 2022), *objections overruled*, No. 6:21-CV-03946, 2022 WL 4546721 (W.D. La. Sep. 27, 2022) (noting "the foundational principle that solicitation of a charitable donation of anything of value by an individual (i.e., panhandling) is protected speech under the First Amendment"); *Gbalazeh v. City of Dallas*, No. 3:18-CV-0076-N, 2019 WL 2616668, at *1 (N.D. Tex. June 25, 2019) (preliminarily enjoining regulation restricting "panhandling" as a content-based restriction on speech); *Blitch v. City of Slidell*, 260 F. Supp. 3d 656, 664 (E.D. La. 2017) (*Schaumburg* "compels the conclusion that the First Amendment [] protects an individual's right to ask for charity").

(exempting solicitation permit-holders only from the crime of obstruction of a public sidewalk); *see also* Miss. Code § 17-31-3 (definition of "Governing authority" indicating that a "sidewalk" is one place "where . . . solicitation occurs").

### 3.    The Act fails First Amendment scrutiny.

As discussed above, the government's ability to restrict speech in traditional public fora is "very limited" because public streets and sidewalks "occupy a special position in terms of First Amendment protection because of their historic role as sites for discussion and debate." *McCullen*, 573 U.S. at 476 (citation modified). Under the First Amendment, the State "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citation modified). A law restricting solicitation "based on topic, subject matter, or viewpoint" is a content-based restriction on speech subject to strict scrutiny. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 72 (2022).

### i.    The Act is content-based and fails strict scrutiny.

The Act criminalizes charitable solicitation (*e.g.*, charitable requests for employment, food, or money)[7] and commercial solicitation (*e.g.*, requests for money, employment, or goods in exchange for merchandise, goods or wares)[8] but does not criminalize solicitation for things that do not have financial value or things whose financial value is not easily quantifiable in monetary terms (*e.g.*, requests for directions or to attend an event, sign a petition, or support a political cause). This is a content-based restriction on speech because the Act restricts speech based on the topic and subject matter of the solicitation.

---

[7] *See* Miss. Code § 17-31-3(b) ("'Solicitation' . . . means to request money or anything of value as a donation or contribution . . . .").

[8] *See* Miss. Code § 17-31-3(b) ("'Solicitation' . . . [also] means . . . to request any other thing of value in exchange for any goods, wares, merchandise or thing of value . . . .").

The key statutory term in the Act is "value." The Act makes it unlawful to solicit (1) "money or anything of <u>value</u> as a donation or contribution" or (2) "any other thing of <u>value</u> in exchange for any goods, wares, merchandise or thing of <u>value</u>" without a solicitation permit. Miss. Code § 17-31-3(b) (emphasis added). Because the Act does not define the term "value," the Court should give that "term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The Fifth Circuit "often looks to dictionary definitions to determine the ordinary meaning of key statutory terms." *Adams v. All Coast, L.L.C.*, 15 F.4th 365, 371 (5th Cir. 2021).

Relying on dictionary definitions, the Fifth Circuit has defined the term "value" as "the monetary worth of something," *see United States v. Garcia*, 883 F.3d 570, 574 (5th Cir. 2018) (quoting Merriam Webster's Collegiate Dictionary (10th ed. 2002)), or "the amount of goods, services, or money that something commands in an exchange," *PBBM-Rose Hill, Ltd. v. Comm'r of Internal Revenue*, 900 F.3d 193, 206 (5th Cir. 2018) (quoting *Value*, Black's Law Dictionary (10th ed. 2014)). Applying the ordinary meaning of the word "value" to the Safe Solicitation Act, the Court should conclude that the Act is a content-based restriction on speech that treats solicitation differently depending on the topic and subject matter of the solicitation: the Act

criminalizes charitable[9] and commercial[10] solicitation but does not criminalize requests that do not

have monetary value or requests that are not readily quantifiable in monetary terms (*i.e.*, soliciting

directions, a signature on a petition, or support for a political candidate or cause).

Other courts have reached similar conclusions. In *Clatterbuck v. City of Charlottesville*, for

example, the Fourth Circuit concluded that an ordinance that distinguished between types of

solicitation—prohibiting "solicitations that request immediate donations of things of value, while

allowing other types of solicitations, such as those that request future donations, or those that

request things which may have no 'value'"—was a content-based restriction on speech. 708 F.3d

549, 556 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert*, 576 U.S. 155

(2015). Similarly, in *Messina v. City of Fort Lauderdale*, a district court found that an ordinance

that distinguished between different "topics" of solicitation was a content-based restriction on

speech. 546 F. Supp. 3d 1227, 1240 (S.D. Fla. 2021). The court explained that the ordinance

> limits in-person, vocal solicitations for money or things of value. But it *doesn't*
> touch other topics of discussion. So, for instance, people are free to solicit
> pedestrians—in person and vocally—for advice, for directions, for their prayers,
> for a signature on a petition, to read a treatise by John Locke, to join a political
> party, to visit a restaurant, to come to church, to put on Tefillin, to shake a Lulav, to
> kiss an Etrog, to join a softball team, etc. As long as the speaker doesn't say

[9] The first clause in Miss. Code § 17-31-3(b) criminalizes charitable solicitation: that is, "request[ing] money or anything of value as a donation or contribution . . . ." The ordinary meaning of donation or contribution is a charitable contribution of anything of financial value. A person donates or contributes money but does not donate or contribute, for example, a signature, directions, or a vote for a political candidate. *See Nat'l Fed'n of the Blind of Tex., Inc. v. City of Arlington*, 109 F.4th 728, 735 (5th Cir. 2024) ("[D]onation" means "[a] gift, esp[ecially] to a charity; something, esp[ecially] money, that someone gives to a person or an organization by way of help.") (quoting *Donation*, Black's Law Dictionary (11th ed. 2019)); *see also Pace Indus. Union-Mgmt. Pension Fund v. WestRock RKT Co.*, No. 1:21-CV-02852-ELR, 2022 WL 22694305, at *6 (N.D. Ga. Sep. 29, 2022) ("contribution" is the "amount of money one gives in order to help pay for something.") (quoting *Contribution*, Black's Law Dictionary (11th ed. 2019)).

[10] The second clause in Miss. Code § 17-31-3(b) criminalizes commercial solicitation: soliciting "any other thing of value" (e.g., money, labor, or any other tangible object of financial value) "in exchange for any goods, wares, merchandise or thing of value . . . ."

something to the effect of "I'm poor, please help" or "Do you have some spare change?" he may approach a stranger anywhere in the City and utter any *other* message. Because the Panhandling Ordinance prohibits one topic and allows all others, it is content based.

*Id.* at 1240–41.

And in *Scott v. City of Daytona Beach Fla.*, a district court found that an ordinance restricting solicitation was also a content-based restriction on speech because it restricted solicitation based on the subject matter or topic of the solicitation. 740 F. Supp. 3d 1205 (M.D. Fla. 2024), *appeal filed*, No. 23-13119 (11th Cir. Oct. 4, 2024). The ordinance, the court reasoned, "circumscribes only solicitations for donations, but not solicitations to patronize a business, attend an event, or support a religious or social cause." *Id.* at 1216. "Therefore, this is not a case where the government regulates all types of solicitations without regard to topic, subject matter, or viewpoint. Strict scrutiny applies." *Id.*

Defendants cannot meet their burden to satisfy strict scrutiny. "Strict scrutiny requires a restriction to be the least restrictive means of achieving a compelling governmental interest and is the most demanding test known to constitutional law." *LIA Network*, 163 F.4th at 163 (citation modified). A content-based restriction on speech is "presumptively unconstitutional" under the First Amendment. *Reed*, 576 U.S. at 163.

Because the Act is called the "Safe Solicitation Act," Defendants may argue that the purpose of the Act is to protect public safety. But even assuming that traffic safety is a compelling government interest, *see id.* at 171, Defendants cannot meet their burden under strict scrutiny because the Act is not the least restrictive means to achieve those interests. *See, e.g.*, *Blitch*, 260 F. Supp. 3d at 671 ("Slidell's permitting requirement fails strict scrutiny because it is insufficiently tailored to achieve its stated end and unnecessarily burdens protected speech on the public streets and sidewalks of Slidell."). Defendants cannot meet their burden to justify why it is necessary to

14

criminalize solicitation on all public streets in the State of Mississippi, regardless of whether that street is a busy highway or residential throughway[11] or why enforcing existing traffic laws would not be a less restrictive means of achieving the State's interest in public safety. *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1267–68 (11th Cir. 2005) (city failed to meet its burden to justify why content-based sign code provisions were narrowly tailored to serve traffic safety).

### ii. Even if the Act is content-neutral, it fails intermediate scrutiny.

Even if this Court finds that the Solicitation Act does not draw facial distinctions based on the topic or subject matter of the solicitation, it still fails intermediate scrutiny. "While not as exacting as strict scrutiny, intermediate scrutiny is no gimme for the government[:] the burden of justification is demanding." *LIA Network*, 163 F.4th at 165 (citation modified). The narrow tailoring requirement of intermediate scrutiny "demand[s] a close fit between ends and means." *McCullen*, 573 U.S. at 486 (citation modified). The government must provide "rigorous," case-specific proof that it "considered less speech-restrictive measures," *LIA Network*, 163 F.4th at 167, and that "alternative measures that burden substantially less speech would fail to achieve [its] interests." *McCullen*, 573 U.S. at 495.

In *LIA Network*, the Fifth Circuit recently invalidated an ordinance that restricted roadside solicitation because the City presented insufficient evidence to satisfy the requirements of narrow tailoring. 163 F.4th at 167–68. Based on *McCullen*, the court of appeals signaled its disapproval of relying "on case law" to meet that burden, and it emphasized that the government must come

---

[11] *Cf. Reynolds*, 779 F.3d at 231 (County failed to satisfy its burden to establish narrow tailoring under intermediate scrutiny because County's evidence "established, at most, a problem with roadway solicitation at busy intersections in the west end of the county. Given the absence of evidence of a county-wide problem, the county-wide sweep of the Amended Ordinance burdens more speech than necessary, just as the statute in *McCullen*—a statewide statute aimed at a problem in one location—burdened more speech than necessary.").

forward with case-specific evidence to support its interests and that alternative measures would be inadequate to meet those interests. *See id.*

Defendants cannot meet their burden under narrow tailoring. The Act applies statewide (except in those few municipalities that opted out) and makes no distinction between heavily trafficked areas and roads and sidewalks that pose a less significant traffic safety concern. And, as discussed above, during the House Floor debate, Representative Yates (the bill sponsor) conceded that she had no data that would justify restricting charitable solicitation.[12]

Courts have invalidated similar statutes because defendants had failed to produce any case-specific "evidence . . . that roadside exchanges . . . endanger the public," *Martin v. City of Albuquerque*, 396 F. Supp. 3d 1008, 1036 (D.N.M. 2019) (citation modified), or that the law was narrowly tailored to prohibit solicitation on roadways that actually create a public safety risk, *see Petrello v. City of Manchester*, No. 16-CV-008-LM, 2017 WL 3972477, at *12, 20 (D.N.H. Sept. 7, 2017). In *Vigue v. Shoar*, for example, a district court found that the government could not satisfy its burden to demonstrate that a statute was narrowly tailored because it swept too broadly: an "outright prohibition on charitable solicitation is overbroad," the district court found, because it fails "to take into account that traffic hazards may vary." 494 F. Supp. 3d 1204, 1228 (M.D. Fla. 2020), *appeal dismissed*, No. 20-14285-V, 2021 WL 11628665 (11th Cir. Sept. 1, 2021); *see also Reynolds*, 779 F.3d at 232 ("[T]here is no evidence that the County ever tried to improve safety by prosecuting any roadway solicitors who actually obstructed traffic, or that it ever even considered prohibiting roadway solicitation only at those locations where it could not be done safely. Without such evidence, the County cannot carry its burden of demonstrating that the Amended Ordinance is narrowly tailored."); *McCraw*, 973 F.3d at 1077 (similar).

---

[12] *See supra* n.4.

Moreover, Defendants cannot "*prove* that [they] actually *tried* other methods to address the problem" and that those alternatives are inadequate to meet the State's public safety interests. *See Reynolds*, 779 F.3d at 231; *see also Cutting*, 802 F.3d at 91 (City failed to demonstrate that ordinance was narrowly tailored because the record contained inadequate evidence why "less speech restrictive means of addressing the safety concerns it identified" would fail to protect public safety). The Supreme Court has explained that a defendant cannot satisfy narrow tailoring when, as here, there are "a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech." *McCullen*, 573 U.S. at 494; *see also Vigue*, 494 F. Supp. at 1229 (State could not satisfy narrow tailoring because State's interests "in road safety '[could] be better served by measures less intrusive than a direct prohibition on solicitation'" (quoting *Schaumburg*, 444 U.S. at 637)).

But even if this Court found that the Act satisfied narrow tailoring, Defendants cannot demonstrate that the Act leaves open ample alternative channels for communication. To be valid, a time, place, and manner restriction must "leave open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Remaining channels must be "meaningful even if [they are] not the one[s a plaintiff] would have chosen." *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 952 (11th Cir. 2022). The Supreme Court has held that where alternative channels "are less likely to reach" the intended audience and "may be less effective" at "communicating the message" they are inadequate. *Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 93 (1977).

The Act does not leave open ample alternative channels for communication because it applies to all public streets and sidewalks statewide unless a county or municipality opted out of the law. Miss. Code § 17-31-11. And any alternative fora would be inadequate for Plaintiffs to

deliver their message given the importance to Plaintiffs of communicating their requests for charity on public streets and sidewalks. *See* Ex. H, Black Decl. ¶ 6; Ex. I, Owens Decl. ¶ 6; Ex. J, Wright Decl. ¶ 7; *see also Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002) ("[T]he simple fact that [a plaintiff] is permitted to communicate his message elsewhere does not end our analysis if the intended message is rendered useless or is seriously burdened."). Courts considering similar prohibitions on speech in particular geographic areas have found they are permissible only to the extent that the alternative fora allow plaintiffs' speech to "accomplish [their] objective." *Cutting*, 802 F.3d at 88–89 (striking down categorical ban on speech on all public roadway medians because other available fora—sidewalks and parks—did not enable plaintiffs to adequately achieve their speech objectives) (quoting *McCullen*, 573 U.S. at 489). And, as the Supreme Court explained, "the streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State*, 308 U.S. 147, 151–52 (1939).

Plaintiffs solicit to meet the necessities of life and therefore must solicit where their speech can be heard. *See* Ex. H, Black Decl. ¶¶ 2, 6; Ex. I, Owens Decl. ¶¶ 2, 6; Ex. J, Wright Decl. ¶¶ 2, 7. Because of the amount of traffic, public roads and sidewalks are the fora where Plaintiffs are most likely to be able to engage with members of the public from whom they might receive assistance. This Court should therefore conclude that Plaintiffs can most meaningfully "accomplish [their] objective" by speaking to motorists while standing by roadways and sidewalks, *McCullen*, 573 U.S. at 489, and that the alternative fora are inadequate to exercise their constitutional rights.

4.    **The Act is an unconstitutional prior restraint on speech.**

The Act also violates the First Amendment because it is a prior restraint on speech: the Act requires individuals to first apply for and receive permission from a government official before engaging in protected expression. "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). "A prior restraint, while not *per se* unconstitutional, bears a heavy presumption against its constitutional validity." *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280–81 (5th Cir. 2003). As the Supreme Court has explained:

> The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

*Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558–59 (1975).

Thus, "[a] party enforcing a prior restraint 'carries a heavy burden of showing justification for the imposition of such a restraint.'" *Chiu*, 339 F.3d at 281 (quoting *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)). The burden that the State must carry to justify a prior restraint on speech depends on whether the prior restraint is content-based or content-neutral. A content-based prior restraint on speech is examined under strict scrutiny whereas a content-neutral prior restraint on speech is examined under intermediate scrutiny. *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 693 (W.D. Tex. 2015), *abrogated in part on other grounds by N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, (2022).

As discussed above, the Act is a content-based restriction on speech because it requires Plaintiffs to obtain a permit before engaging in charitable solicitation but not before engaging in other forms of solicitation (e.g., asking for directions, a signature on a petition, or support for a

political cause). Defendants cannot satisfy their burden to demonstrate that the prior restraint is the least restrictive means to effectuate a compelling government interest.

But, even if this Court found that the prior restraint is content-neutral, Defendants cannot satisfy intermediate scrutiny for the reasons discussed above, *supra* Part III.b.3.ii. The prior restraint is not narrowly tailored to serve a substantial government interest and does not leave open ample, alternative channels of communication.

### a.      The Act lacks adequate procedural safeguards.

"The settled rule is that a system of prior restraint 'avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system.'" *Conrad*, 420 U.S. at 559 (quoting *Freedman v. Maryland*, 380 U.S. 51, 58 (1965)). All prior restraints on speech—whether content-based or content-neutral—require certain procedural protections. These procedural safeguards include, at a minimum, "adequate standards to guide the official's discretion" and the opportunity for "effective judicial review." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002). Without these procedural protections, there is an intolerable "risk of indefinitely suppressing permissible speech." *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 227 (1990) (plurality opinion); *see also Riley*, 487 U.S. at 802 (1988) (invalidating licensing scheme failing to provide for definite time limitations to issue a license because the "delay compel[led] the speaker's silence"). If a prior restraint is content-based, however, additional procedural safeguards are required, namely, the government must seek a judicial order to restrain the speech and bear the burden of justifying that restraint in court. *Thomas*, 534 U.S. at 321.

Even if this Court concludes that the Act is a content-neutral prior restraint on speech, the Act violates the First Amendment because it contains neither of the minimal procedural protections required to justify a prior restraint on speech. The Act does not constrain Defendants' discretion or

20

provide any opportunity for judicial review if a permit application is denied. This Court should preliminarily enjoin Defendants from enforcing the Act for these reasons alone.

### i. The Act gives unbridled discretion to Defendants to grant or deny a solicitation permit.

To survive First Amendment scrutiny, a licensing scheme must contain "narrow, objective, and definite standards to guide the licensing authority." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969). "Unbridled discretion runs afoul of the First Amendment because it risks self-censorship and creates proof problems in as-applied challenges." *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020). "[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). If a statute "vests unbridled discretion in a government official over whether to permit or deny expressive activity," a plaintiff "may challenge it facially without the necessity of first applying for, and being denied, a license." *Id*. at 755–56. "[T]he existence of time limits for processing applications" is part of the inquiry for whether a "scheme vests the licensing official with 'unduly broad discretion.'" *Morris v. City of New Orleans*, 350 F. Supp. 3d 544, 559 (E.D. La. 2018) (quoting *Thomas*, 534 U.S. at 323–24).

On its face, the Act contains no explicit standards to guide Defendants' discretion about whether a licensing permit should be issued or denied (or when that decision must be made). The discussion of the permitting process is brief: "Any person who wishes to solicit," Miss. Code § 17-31-7(1)(a) states, "shall obtain a solicitation permit from the municipality, county or political subdivision in which the solicitation will occur."

The absence of guidance constraining Defendants' discretion violates the First Amendment. On its face, nothing in the Act would prevent Defendants from approving permits for

21

some forms of solicitation—religious, political, or organized charities, for example—while denying permits for disfavored forms of solicitation such as solicitation to meet one's own needs. In fact, Defendants' solicitation application requires applicants to identify whether the solicitation is for an "organization" or for an individual—suggesting that Defendants could consider the speaker's affiliation in determining whether to approve or deny a solicitation permit. *See* Application, Ex. A. Nor is there any requirement for Defendants to approve or deny a permit application within a certain time after the application's submission. Finally, neither the Act nor Defendants' policies contemplate a process for judicial review if a permit application is denied.

Courts have struck down similar statutes regulating solicitation when those statutes failed to include specific, detailed criteria to guide law enforcement's discretion. *See, e.g.*, *Vigue*, 494 F. Supp. 3d at 1226 (invalidating solicitation permitting scheme because the statute "includes no explicit standards for issuance other than general safety, no time limits, and no review process for denials"). Moreover, while a court "must consider the county's authoritative constructions of the [statute], including its own implementation and interpretation of it," Defendants have not interpreted the statute in a way that constrains their discretion. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992).[13] Regardless, any limitations on the government's discretion "implicit" in a law must "be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Lakewood*, 486 U.S. at 770. The "Court will not write nonbinding limits into a silent state statute." *Id.*

In short, the Act grants Defendants unbridled discretion to grant or deny a permit and provides no opportunity for effective judicial review if a permit application is denied. Thus, even

---

[13] Plaintiffs have submitted multiple public records requests to the Capitol Police for Defendants' written policies concerning the Safe Solicitation Act, but no records have been produced.

if this Court concludes that the Act is a content-neutral prior restraint on speech, this Court must enjoin it as violating the First Amendment.

### ii. The Act facially and as applied requires unnecessary permit fees.

Generally, "[a] state may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943) (invalidating licensing fee to distribute religious materials under the First Amendment). A statute violates the First Amendment if the government imposes a tax on "the dissemination of views because they are unpopular, annoying or distasteful." *Id.* at 116. Licensing fees are "as potent as the power of censorship which [the Supreme] Court has repeatedly struck down." *Id.* at 113.

In the Fifth Circuit, licensing fees will only be upheld if the government meets its burden to demonstrate "that the fees are necessary" to defray administrative costs, *Fernandes v. Limmer*, 663 F.2d 619, 633 (5th Cir. 1981), and have a "relationship to solving the problems that supposedly justify their imposition," *Int'l Women's Day Mar. Plan. Comm. v. City of San Antonio*, 619 F.3d 346, 370 (5th Cir. 2010). Applying this standard, the Supreme Court and Fifth Circuit have struck down licensing fees repeatedly because the government failed to meet its burden to justify their imposition. *See, e.g.*, *Murdock*, 319 U.S. at 116 (striking down flat fee imposed on door-to-door solicitors, as it was not "calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors"); *Fernandes*, 663 F.2d at 632–33 (striking down permit application fee because defendant failed to "demonstrate a link between the fee and the costs of the licensing process").

Defendants cannot satisfy their burden to demonstrate that the licensing fee is necessary to defray the burdens on the government associated with solicitation. The Act authorizes Defendants to charge up to $25 per day for each solicitation permit. Miss. Code § 17-31-5(2). In practice,

23

Defendants always require Plaintiffs to pay the maximum amount authorized under the Act. *See* Application, Ex. A. Unlike parades or demonstrations—which often require security or clean-up crews—there are no special administrative, law enforcement, or government expenses associated with solicitation that justify charging each person this amount to engage in protected First Amendment activity.

Plaintiffs—and a putative Class of people who solicit charity to meet their basic needs—wish to convey social and political messages about hunger, homelessness, poverty, and illness inextricably linked to their messages of need. Applying the licensing fee requirement to Plaintiffs would completely suppress their ability to engage in protected speech because they do not have the funds to pay the fee. *See* Ex. H, Black Decl. ¶ 3; Ex. I, Preston Decl. ¶ 3; Ex. J, Wright Decl. ¶ 3; *see also Fernandes*, 663 F.2d at 632 ("Were states permitted to tax First Amendment activities, the eventual result might be the total suppression of all those voices whose pockets are not so deep."). A preliminary injunction is warranted because "[f]reedom of speech . . . [must be] available to all, not merely to those who can pay their own way." *See Murdock*, 319 U.S. at 111; *see also Buckley v. Valeo*, 424 U.S. 1, 49 (1976) ("The First Amendment's protection against governmental abridgment of free expression cannot properly be made to depend on a person's financial ability to engage in public discussion.").

### iii. The Act criminalizes spontaneous speech.

Prior restraints raise First Amendment concerns because "there is a significant amount of spontaneous speech that is effectively banned." *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 167 (2002). Such prior restraints on speech are inconsistent with the "free and general discussion of public matters" protected under the First Amendment. *Id.* at 168 (citation modified). The Act violates the First Amendment because it interferes with Plaintiffs'

right to engage in spontaneous speech and Defendants cannot demonstrate that the interference is narrowly tailored to justify that infringement.

The Supreme Court has consistently struck down permitting schemes that apply to individual speakers—as opposed to large groups—in the context of solicitation that occurs at private homes. *See, e.g.*, *Watchtower*, 536 U.S. at 166–67; *Schaumburg*, 444 U.S. at 638–39 (striking down solicitation permit requirement); *Cantwell v. Connecticut*, 310 U.S. 296, 301, 306–07 (1940) (striking down a license requirement as applied to Jehovah's Witnesses "going singly from house to house" for the purpose of religious solicitation); *Schneider v. New Jersey*, 308 U.S. 147, 163–64 (1939) (striking down a permitting scheme covering all forms of solicitation). The Court has recognized that the government's interests—the prevention of crime and fraud, and the protection of residential privacy—are weighty. *See, e.g., Watchtower*, 536 U.S. at 164–65. Nonetheless, it has repeatedly concluded that single-speaker permitting requirements are not a constitutionally valid means of advancing those interests because (1) they sweep too broadly, *id.* at 165–66; (2) they only marginally advance the government's interests, *id.* at 168–69; and (3) the government's interests can be achieved through less intrusive means, *id.*

The Fifth Circuit, too, has held that "ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest." *Knowles v. City of Waco, Tex.*, 462 F.3d 430, 436 (5th Cir. 2006). Indeed, "almost every . . . circuit to have considered the issue ha[s] refused to uphold registration requirements that apply to individual speakers or small groups in a public forum." *Berger v. City of Seattle*, 569 F.3d 1029, 1039 (9th Cir. 2009); *see also Marcavage v. City of Chicago*, 659 F.3d 626, 635 (7th Cir. 2011) (noting that the "powerful consensus" among circuit courts invalidating single-speaker permitting schemes "cannot be ignored") (collecting cases).

A preliminary injunction is warranted because Defendants cannot meet their burden to demonstrate that the single-speaker permitting requirement is narrowly tailored to justify the infringement on Plaintiffs' First Amendment right to engage in spontaneous speech.

### iv.      The Act infringes Plaintiffs' right to engage in anonymous speech.

"[A]nonymous speech is protected by the First Amendment." *Just. For All v. Faulkner*, 410 F.3d 760, 764 (5th Cir. 2005). "The Supreme Court has subjected disclosure requirements to heightened scrutiny when such requirements might deter First Amendment protected activity," *Cornelio v. Connecticut*, 32 F.4th 160, 170 (2d Cir. 2022), and has consistently struck down statutes that prevent people from exercising their First Amendment rights without first disclosing their identity. *See, e.g.*, *Watchtower*, 536 U.S. at 165–6 (concluding that "it is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so."); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995); *Talley v. California*, 362 U.S. 60 (1960).

The Act requires Plaintiffs to surrender their First Amendment right to engage in anonymous solicitation. The Act makes it "unlawful for any person to solicit in any municipality, county or political subdivision of this state without a solicitation permit." Miss. Code § 17-31-5(1). Plaintiffs must "state the[ir] name, mailing address and telephone number" on the application, Miss. Code § 17-31-9(3), and Defendants' solicitation permit requires Plaintiffs to "possess this permit while engaging in solicitation activities." *See* Permit, Ex. B.

A preliminary injunction is warranted because Defendants cannot demonstrate that the infringement of Plaintiffs' right to engage in anonymous speech is narrowly tailored to meet any significant government interest. For example, the law does not limit identification requirements to

26

speakers who violate city or state laws. Limiting identification requirements to such circumstances would be a less burdensome means of achieving the State's interests and would not amount to "a dramatic departure from our national heritage and constitutional tradition" requiring disclosure only when a speaker violates the law. *See Watchtower*, 536 U.S. at 166.

### 5.    The statute is unconstitutionally overbroad.

The government may not regulate speech "by means which sweep unnecessarily broadly." *See NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 307 (1964). The First Amendment overbreadth doctrine rests on the need to eliminate an overbroad law's "chilling effect" on protected expressive activity. *Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965). "An outright ban on the use of [a public] forum for expressive purposes" without a permit "can seldom, if ever, be justified." *Fernandes*, 663 F.2d at 633 (invalidating law prohibiting solicitation without a license under the overbreadth doctrine).

The Safe Solicitation Act sweeps a substantial amount of protected speech activity into its ambit. *See Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 580 (1998) ("To prevail [on an overbreadth claim, a plaintiff] must demonstrate a substantial risk that application of the provision will lead to the suppression of speech."). The Act sweeps so broadly, in fact, that Plaintiffs are completely barred from engaging in protected speech on traditional public fora without a permit. *Dallas Ass'n of Cmty. Orgs. for Reform Now v. Dallas Cnty. Hosp. Dist.*, 670 F.2d 629, 633 (5th Cir. 1982) (per curiam) (invalidating solicitation law because it "restricts every single mode of expression, including pure speech," even when it would not "disrupt the purposes of the hospital").

As discussed above, enforcing existing traffic laws would better address traffic safety and would be "less intrusive than a direct prohibition on solicitation." *Schaumburg*, 444 U.S. at 637. The Safe Solicitation Act is therefore unconstitutionally overbroad.

27

### 6.    The Act is void for vagueness.

The Act is void for vagueness under the Due Process Clause because it fails to provide sufficient guidance to governing authorities to avoid arbitrary and discriminatory enforcement of the permitting scheme. "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108–09. The State's regulation is subject to a "stringent" vagueness standard because the Act "threatens to inhibit the exercise of constitutionally protected rights." *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

Defendants cannot meet their stringent burden to demonstrate that the Act is not impermissibly vague. The Act provides inadequate guidance to local jurisdictions about how to enforce the prior restraint on speech. For example, the Act leaves it up to each local government to develop their own permit applications and processes. The Act does not specify a timeframe for when a solicitation permit must be approved or denied, the criteria that a jurisdiction should consider when deciding whether to approve a solicitation permit, or how to determine the permit application cost. The Act is void for vagueness, in other words, because jurisdictions across the State are left to enforce a statewide prior restraint on speech in disparate and inconsistent ways. *See Intl Soc'y for Krishna Consciousness, Inc. v. Lentini*, 461 F. Supp. 49, 51 (E.D. La. 1978) (absence of standards to guide approval of solicitation permit violated due process because regulations were "too vague and overbroad and vests total unfettered discretion in the Director").

### C.    Plaintiffs will suffer irreparable harm without an injunction.

28

Plaintiffs are "likely to suffer irreparable harm" absent an injunction. *See Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) (citation modified). Irreparable harm refers to harm for which there is no adequate remedy at law. *Id*. Where "an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (citation modified). The Supreme Court has long recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).

This Court should reach the same conclusion here.

### D.   A preliminary injunction will serve the public interest.

Injunctions protecting First Amendment freedoms are always in the public interest. *Opulent Life Church*, 697 F.3d at 298; *see also Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (holding that where an enactment is unconstitutional, "the public interest [is] not disserved by an injunction preventing its implementation"). Indeed, "[t]he First Amendment retains a primacy in our jurisprudence because it represents the foundation of a democracy—informed public discourse." *Mississippi Women's Med. Clinic v. McMillan*, 866 F.2d 788, 797 (5th Cir. 1989). Nor is it in the public interest for Defendants to expend "time, money, and effort in attempting to enforce [statutes] that may well be held unconstitutional." *Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 959 (5th Cir. 1981).

### E.   The balance of equities weighs in favor of an injunction.

The threat of injury to Plaintiffs considerably outweighs any threat of harm to Defendants. As discussed in the proceeding sections, the injury to Plaintiffs' First Amendment rights is substantial and irreparable. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19

(2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Elrod*, 427 U.S. at 373).

For the balance of equities to weigh against an injunction, Defendants must produce "powerful evidence of harm to its interests." *Opulent Life Church*, 697 F.3d at 297. Defendants cannot meet that burden, as other district courts in the Fifth Circuit have found. *See, e.g., Blitch*, 260 F. Supp. 3d at 673 (enjoining solicitation ordinance, finding balance of hardships weighs in favor of protecting First Amendment rights where Defendants "points to no sufficiently weighty competing public interest that outweighs the public interest in enforcing First Amendment protections"). Indeed, the Supreme Court in weighing the balance of equities in the First Amendment context, has found that "[w]here a prosecution is a likely possibility" in the absence of an injunction, "[t]here is a potential for extraordinary harm and a serious chill upon protected speech;" "[t]he harm done from letting the injunction stand pending a trial on the merits, in contrast, will not be extensive;" and "the Government in the interim can enforce [] laws already on the books." *Ashcroft v. ACLU*, 542 U.S. 656, 670–71 (2004).

The same is true here, where Plaintiffs face the possibility of prosecution in the absence of a preliminary injunction, and where Defendants can enforce existing laws to address their interests that do not infringe on Plaintiffs' First Amendment rights.

### F.    The Court should not require Plaintiffs to post a security bond.

The Court should issue injunctive relief without requiring Plaintiffs to post a security bond. Federal Rule of Civil Procedure 65(c) permits security to protect the other party from any financial harm caused by a preliminary injunction. A trial court has discretion on the amount of security required, and Fifth Circuit precedent provides that a court "may elect to require no security at all." *Thomas v. Varnado*, 511 F. Supp. 3d 761, 766 (E.D. La. 2020) (citation modified); *see also City of*

*Atlanta v. Metro Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981) ("[T]he amount of security required by the rule is a matter within the discretion of the trial court.").

Plaintiffs are indigent, and their inability to post bond should not prevent them from obtaining a court order to protect their constitutional rights. *See* Ex. H, Black Decl. ¶ 3; Ex. I, Owens Decl. ¶ 3; Ex. J, Wright Decl. ¶ 3; *see also Wayne Chem. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (affirming district court's order of no bond for indigent person); *Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929, 952 (E.D. Mo. 2004) (requiring no bond for homeless plaintiffs). District courts in the Fifth Circuit have previously exercised their "discretion under Federal Rule of Civil Procedure 65(c) to waive the bond requirement" in cases enjoining solicitation laws. *See Gbalazeh v. City of Dallas*, No. 3:18-CV-0076, 2019 WL 2616668, at *2 (N.D. Tex. June 25, 2019) (citation modified).

This Court should do the same here, too.

### G.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court preliminarily enjoin enforcement of Mississippi's Safe Solicitation Act without requiring them to post bond. Plaintiffs have established a substantial likelihood of success that the Act is facially unconstitutional in violation of the First and Fourteenth Amendments of the U.S. Constitution and as applied by Defendants in this case. The balance of equities weighs in Plaintiffs' favor, and issuance of an injunction is warranted.

Dated: May 27, 2026

Respectfully submitted,

s/ *Joshua Tom*

Joshua Tom
  MS Bar No. 105392
AMERICAN CIVIL LIBERTIES
  UNION OF MISSISSIPPI
P.O. Box 1142
Jackson, MS 39225
(601) 354-3408 (tel.)
(601) 355-6465 (fax)
jtom@aclu-ms.org

Attorney for Plaintiffs

**<u>CERTIFICATE OF SERVICE</u>**

Undersigned counsel does hereby certify that on this date, a true and correct copy of the above and foregoing has been filed with the Clerk of the Court via the Court's electronic filing system, and notification of such filing was sent to all counsel of record via same. I hereby certify that I have sent the document to Lynn Fitch, Mississippi Attorney General, by process server at the Walter Sillers Building, 550 High Street, Jackson, MS 39201.

Dated: May 27, 2026                                s/ *Joshua Tom*

                                                              Joshua Tom